**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 8, 2009

Charles R. Fulbruge III
Clerk

No. 08-60581

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

LEE TAYLOR

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before BARKSDALE, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM:

Lee Taylor appeals his thirty–month sentence, imposed following a jury conviction for fraud in obtaining disaster relief assistance. Taylor also appeals the district court's exercise of jurisdiction over count six, and its entry of an order of restitution and an order of forfeiture.

**I.**

Taylor owned two properties on Howze Street in Moss Point, Mississippi. 3734 Howze Street was Taylor's primary residence until it was subject to foreclosure proceedings in June or July 2005. Taylor also owned 3718 Howze Street, which he stated he occupied after the foreclosure of 3734 Howze Street. 3718 Howze Street had no power, water, or sewage services. Taylor asserts that

he moved some of his personal belongings into 3718 Howze Street approximately three weeks before Hurricane Katrina hit on August 25, 2005. Taylor stated that he stayed at the property two to three nights per week. Mary Nettles, Taylor's girlfriend, testified that Taylor actually moved into her apartment after the foreclosure of 3734 Howze Street. Nettles testified that she helped Taylor move his furniture into a neighbor's house and his personal belongings into her apartment. Nettles stated that from date of the foreclosure at 3734 Howze Street until the landfall of Hurricane Katrina, Taylor stayed at her home five to seven nights per week and did not pay rent. Taylor asserts that Hurricane Katrina caused significant damage to 3718 Howze Street, rendering it uninhabitable.

On September 5, 2005, Taylor applied for disaster relief benefits from the Federal Emergency Management Agency (FEMA) for damages sustained at 3718 Howze Street. On his FEMA application, Taylor listed 3718 Howze Street as his primary residence. A FEMA inspector initially determined that 3718 Howze Street was not Taylor's primary residence. Taylor repeatedly contacted FEMA, asserting that 3718 Howze Street was his primary residence, and that he had moved his belongings into the home but was forced to move them back out in preparation for the storm; had not yet had an opportunity to turn the utilities on, or, alternatively, did not have the funds to do so; and that he was subject to eviction from Nettles's apartment for nonpayment of rent. Following a second inspection, Taylor was granted $2,000 of expedited assistance, $2,358 for rental assistance, $9,477.06 for a personal property award, $10,500 for home repair, and a FEMA trailer. FEMA awarded Taylor assistance based on "hardship and intent to live [at 3718 Howze]", giving Taylor the "benefit of the doubt" that he "was, in fact, residing there but under a hardship of his own because he did not have utilities."

On June 26, 2006, Taylor applied for assistance from the Mississippi Development Authority (MDA). Taylor applied for the Homeowners Assistance

Program Phase II Grant (Phase II Grant), which required that Taylor own and occupy 3718 Howze Street as a primary residence on the day Hurricane Katrina made landfall. Taylor signed a document in connection with his application, acknowledging that the information he provided was accurate and that he also consented to the MDA verifying the information with FEMA. Taylor also filed an affidavit stating that 3718 Howze Street was his primary residence. Taylor was initially approved for the Phase II Grant in the amount of $92,400. Prior to a final determination of his eligibility, Nettles filed a complaint with FEMA, stating that 3718 Howze Street was not Taylor's primary residence and that the property was not habitable prior to landfall of Hurricane Katrina. The MDA became aware of FEMA's investigation and Taylor did not actually receive the funding from the Phase II Grant.

On December 19, 2007, a seven count indictment was filed, charging Taylor with mail fraud in violation of 18 U.S.C. § 1341 (count one); wire fraud in violation of 18 U.S.C. § 1343 (counts two through four); that Taylor stole, purloined, and converted disaster assistance benefits to which he was not entitled in violation of 18 U.S.C. § 641 (count five); and making a materially false statement in violation of 18 U.S.C. § 1001(a)(2) (count six). The indictment also sought an order of forfeiture as authorized by 18 U.S.C. § 981(a)(1)(C) (count seven). On March 12, 2008, the jury found Taylor guilty of counts two through six and not guilty of count one.

Taylor's conviction was published in the local newspaper, which prompted Carla Poole, an employee of Rebuild Jackson County, to contact the government. Poole was permitted to testify at Taylor's sentencing hearing. Poole testified that Rebuild Jackson County was a nonprofit established to provide disaster relief assistance to homeowners who could not meet their own recovery needs. Rebuild Jackson County required that the assistance be used to repay damages to an

individual's primary residence. Rebuild Jackson County had spent $66,764.21 to aid Taylor in rebuilding 3718 Howze Street.

On June 25, 2008, Taylor was sentenced to thirty months of imprisonment and three years of supervised release. The district court held Taylor responsible for $30,241.07 in actual loss to FEMA, $66,764.21 in actual loss to Rebuild Jackson County, $10,000 in intended loss to the Small Business Association (SBA) to which he had applied for a loan, and $91,922 in intended loss to the MDA. In total, Taylor was held responsible for $198,927.28 in losses. The district court also entered a Final Order of Forfeiture in the amount of $23,841.06, ordered Taylor to pay $97,005.28 in restitution to FEMA and Rebuild Jackson County, and imposed a $500 special assessment.

## II.

### A.    Jurisdiction under 18 U.S.C. § 1001(a)(2)

Taylor argues that the district court erred in exercising jurisdiction over count six, making a materially false statement in his application to the MDA in violation of 18 U.S.C. § 1001(a)(2). The MDA was given $5.3 billion by Congress through the United States Department of Housing and Urban Development (HUD), to provide individuals with disaster relief assistance in the form of a community development grant (Phase II Grant). The MDA required that an individual own and occupy the residence for which assistance was requested. The district court held that because the MDA funds were supplied by HUD and because HUD had oversight authority over the general administration of the funds, Taylor's false statement was made to an agency within federal jurisdiction. Taylor argues that the MDA is a state agency with limited federal oversight, and consequently that the district court has no federal agency jurisdiction.

Section 1001(a)(2) prohibits "knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation" in "any

matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a)(2). This section requires the government to prove that Taylor: 1) knowingly and willfully; 2) made a statement; 3) to a federal agency; 4) that was false; and 5) material. § 1001(a)(2); *see also United States v. Baker*, 626 F.2d 512, 514 (5th Cir. 1980). Section 1001 "is designed to protect federal funds and functions from fraudulent interference. In furthering these purposes, it is irrelevant whether defendant knew that his intentionally false statements might eventually influence a federal agency." *Baker*, 626 F.2d at 516.

Although framed as a challenge to the court's jurisdiction, Taylor's argument effectively constitutes a challenge to the sufficiency of the evidence establishing a nexus between his statements to the MDA and the administration of the grant by HUD. *See United States v. Reynolds*, 152 F. App'x 416, 417 (5th Cir. Nov. 2, 2005) (unpublished) (reviewing "whether the false statements were made 'in any matter within the jurisdiction' of [HUD]" for sufficiency of the evidence) (quoting § 1001(a)(2)). "This court reviews a challenge to the sufficiency of the evidence *de novo*." *United States v. Nguyen*, 504 F.3d 561, 567 (5th Cir. 2007). The evidence is reviewed in a light most favorable to the government to determine whether a reasonable factfinder could find the evidence proves guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd*, 462 U.S. 356 (1983). Whether a false statement is made in a "matter within the jurisdiction" of a federal agency is an issue of fact. *United States v. Montemayor*, 712 F.2d 104, 108 (5th Cir. 1983).

The jury heard evidence that HUD funded and provided administrative oversight of the MDA for its Phase II Grants. The MDA was required to submit to HUD a detailed plan on how the money was to be used and to obtain HUD's approval of the plan in order to receive the funding. HUD had the authority to cease funding the program and require the MDA to refund the money if HUD

determined that the MDA was administering the money in violation of HUD guidelines. The MDA was also required to provide quarterly reports to HUD and was regularly audited by HUD.

In *Montemayor*, the defendant challenged the sufficiency of the evidence supporting her conviction, asserting that obtaining a birth certificate from a state agency was not a matter within the jurisdiction of the federal immigration service. *Id*. at 106. Because the acquisition of the birth certificate was done for a "federally connected purpose," namely, to obtain United States citizenship for the defendant's children, the court found that the evidence was sufficient to uphold the jury's verdict. *Id*. at 106-07 ("[A]lthough not made directly to the federal agency itself, [the false statements] may factually be held to be a matter within the jurisdiction of the federal agency."). Taylor's false statement was made to a state agency that was charged with administering a federally funded program. *See id*. at 107 ("[A] false statement made to a local agency administering a federal program has been held to create federal criminal liability under § 1001 . . . ."); *see also United States v. Stanford*, 589 F.2d 285, 297 (5th Cir. 1978) ("[A] statement may concern a matter within the federal jurisdiction described in section 1001, even if the statement is not submitted directly to the federal department or agency involved, and the federal agency involvement is limited to reimbursement of expenditures.").

Finally, the MDA grant application required that Taylor certify that his application was submitted under "penalty of perjury and penalty of violation of Federal and State laws applicable to my application for and receipt of a grant under the above referenced Program" and this certification was made "to the United States Department of Housing and Urban Development and to the Mississippi Development Authority of the State of Mississippi." *See Montemayor*, 712 F.2d at 108 ("[A] showing that the defendant had actual knowledge of

federal involvement might lessen the need for a detailed examination of the federal government's relationship to the statements.").

Taylor also argues that the function of HUD was merely oversight of MDA's management of the program, and that his false statement did not pervert the function of HUD in its oversight capacity. Courts have rejected such a narrow interpretation for a finding of federal jurisdiction. "[T]he term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." *Bryson v. United States*, 396 U.S. 64, 70-71 (1969). Jurisdiction must be defined in a nontechnical manner and "covers all matters confided to the authority of an agency or department." *United States v. Rodgers*, 466 U.S. 475, 479 (1984); *see also United States v. Hames*, 185 F. App'x 318, 323 (5th Cir. 2006) (unpublished) (defendant's false statements were within jurisdiction of the federal court despite the fact that the statements were made to a private contractor for purposes of gaining Medicare assistance and not directly to the federal agency); *Reynolds*, 152 F. App'x at 417 (holding that statements made to private lenders in an attempt to acquire a loan insured by HUD were matters within HUD's jurisdiction); *United States v. Uni Oil, Inc.*, 646 F.2d 946, 954-55 (5th Cir. 1981). "The term 'jurisdiction' merely incorporates Congress'[s] intent that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency." *Stanford*, 589 F.2d at 297 (citing *United States v. Gilliland*, 312 U.S. 86, 93 (1941)). Taylor's false statement contravened the intent of the MDA Phase II Grant, funded by HUD, which was to provide disaster relief assistance to individuals who suffered damage to homes owned and occupied when Hurricane Katrina struck. Perpetration of this fraud had the potential to divert a portion of these funds from an individual who was entitled to receive them.

We find that the evidence is sufficient to uphold Taylor's conviction as to count six. Taylor's false statements made to the MDA were made in a matter

within the jurisdiction of a federal agency for purposes of 18 U.S.C. § 1001; thus, the district court properly exercised its jurisdiction over this count.

**B.      Loss Calculation**

The Pre-Sentence Investigation Report (PSR) held Taylor accountable for $30,241.07 in actual loss to FEMA, $66,764.21 in actual loss to Rebuild Jackson County, $10,000 in intended loss to the SBA, and $91,922 in intended loss to the MDA. In total, the PSR found that Taylor was responsible for $198,927.28 in losses. The district court adopted the loss calculations set forth in the PSR. Taylor argues that the district court erred in calculating his intended loss amount to the MDA and the SBA for sentencing purposes. Taylor asserts that he intended to repay the $10,000 loan to the SBA and that the total amount he would have received from the MDA was significantly less than the court had calculated.

This court reviews the district court's application of the Sentencing Guidelines de novo. *United States v. Lewis*, 476 F.3d 369, 389 (5th Cir. 2007). "Factual determinations regarding loss amount for guideline calculation purposes are reviewed for clear error." *United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009). "A district court's determination of the amount of loss caused by fraud is given wide latitude." *United States v. Brewer*, 60 F.3d 1142, 1145 (5th Cir. 1995). "[A]s long as the finding is plausible in light of the record as a whole, it is not clearly erroneous." *United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993).

Intended loss is "the pecuniary harm that was intended to result from the offense." U. S. Sentencing Guidelines Manual § 2B1.1(b)(2), comment. (n.3(A)(ii)) (2008). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." *Id.*, comment. (n.3(A)(iii)). "The court need only make a reasonable estimate of the loss." *Id.*, comment. (n.3(C)). "The sentencing judge is in a unique position to assess the evidence and estimate the loss based

8

upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." *Id*. The determination of the amount of loss for calculations under U.S.S.G. § 2B1.1(b)(1) requires the use of the greater of actual loss or intended loss. *Id*., comment. (n.3(A)).

Taylor argues that there was no evidence to support the district court's finding that he intended to receive the full amount of the MDA's Phase II grant. Taylor argues that the initial amount of assistance for which he was approved should be reduced by a portion of the proceeds he received from FEMA and the full amount of proceeds he received from Rebuild Jackson County, and asserts that the total grant award should be calculated at 70% of this amount. Taylor calculates his intended loss to the MDA at $38,515.05. Taylor also argues that the district court failed to make a finding as to his intent to repay the SBA loan.

The PSR, which was adopted by the district court, calculated Taylor's loss as $198,927.28, placing it within it the sentencing range of more than $120,000 but less than $200,000. Assuming *arguendo* that Taylor's loss calculation should be reduced by $10,000 for the SBA loan and the intended loss to MDA should be $38,315.05, Taylor's total loss calculation totals $135,320.33, still within the $120,000 to $200,000 guidelines range. Any error resulting from recalculation of this sum does not affect Taylor's substantial rights, and therefore is harmless. *See* FED. R. CRIM. P. 52(a); *cf. United States v. Pineiro*, 410 F.3d 282, 285-86 (5th Cir. 2005).

**C.    Restitution and Forfeiture**

Taylor challenges the district court's entry of both an order of restitution and an order of forfeiture. This court reviews the district court's legal conclusions as to the propriety of a forfeiture order de novo. *United States v. 1977 Porsche Carrera 911*, 946 F.2d 30, 33 (5th Cir. 1991). This court reviews the legality of a restitution order de novo. *United States v. Chaney*, 964 F.2d 437,

451 (5th Cir. 1992). If the restitution order is legally permitted, the order is reviewed for an abuse of discretion. *Id*. at 451-52.

Taylor first challenges the district court's order of forfeiture as to counts two through four, which found Taylor guilty of wire fraud in violation of 18 U.S.C. § 1343, arguing that these counts must involve a "racketeering activity" in order to support an order of forfeiture. Section 981(a)(1)(C) makes "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(C). The term "specified unlawful activity," is "any act or activity constituting an offense listed in section 1961(1) . . . ." 18 U.S.C. § 1956(c)(7)(A). 18 U.S.C. § 1961(1)(B) provides an alternate definition of "racketeering activity," including "any act which is indictable under any of the following provisions," listing 18 U.S.C. § 1343 "(relating to wire fraud)." Thus, the plain language of the statute supports the district court's order of civil forfeiture following Taylor's indictment and conviction of committing wire fraud in violation of 18 U.S.C. § 1343.

Taylor also challenges the order to forfeit funds to the Department of Justice as unauthorized under 28 U.S.C. § 2461(c)  because, having also been ordered to pay restitution to FEMA pursuant to the Mandatory Victim Restitution Act (MVRA),  the forfeiture payment results in double compensation to the United States government. The parties agree that the district court properly ordered restitution; the dispute centers on whether the court should have also ordered forfeiture and whether the forfeiture award should be reduced by the amount of restitution.

The MVRA states that when the defendant is convicted of causing an identifiable victim to suffer pecuniary loss, the district court "*shall* order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1) (emphasis

added). 28 U.S.C. § 2461(c) states that when a defendant has been convicted of an offense for which civil forfeiture is authorized, the district court "*shall* order the forfeiture of the property as part of the sentence . . . ." (emphasis added).

In *United States v. Emerson*, 128 F.3d 557 (7th Cir. 1997), the district court had entered an order for restitution to the United States Postal Service and entered an order for forfeiture to the United States Department of Justice following defendant's conviction for money laundering. *Id.* at 566. The *Emerson* court noted that under the plain language of the statutes, forfeiture was mandated and imposition of restitution was permitted. *Id.* The court held that "the relevant statutes do not address the appropriateness or inappropriateness of ordering both forfeiture and restitution," and that it had found "no compelling precedent suggesting that the district court could not order both restitution and forfeiture." *Id*; *see also United States v. Feldman*, 853 F.2d 648, 663 (9th Cir. 1988) (holding that the district court does not lose its discretion to impose restitution merely "because a defendant must also forfeit the proceeds of illegal activity").

*Emerson* also noted the distinct purposes served by restitution and forfeiture:

> paying restitution plus forfeiture at worst forces the offender to disgorge a total amount equal to twice the value of the proceeds of the crime. Given the many tangible and intangible costs of criminal activity, this is in no way disproportionate to the harm inflicted upon government and society by the [offense]. . . . [P]ayment of restitution in no way alters the status of the property as ill-gotten gains. Restitution operates to make the victim of the crime whole, not to confer legal ownership on the offender of the stolen property. As a result, [the defendant's] payment of restitution prior to forfeiture makes no difference in our double jeopardy analysis.

128 F.2d at 567 (quoting *United States v. Various Computers & Computer Equip.*, 82 F.3d 582, 588 (3d Cir. 1996) (quotations and citation omitted)); *see also United States v. Webber*, 536 F.3d 584, 602-03 (7th Cir. 2008) ("Forfeiture and restitution are distinct remedies. Restitution is remedial in nature, and its goal is to restore the victim's loss. Forfeiture, in contrast, is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity.") (citations omitted).

We agree with the reasoning of the *Emerson* court and hold that the district court's order for both restitution and forfeiture is permissible. The district court properly adhered to the mandatory language found within the statutory schemes. However, this does not answer whether these orders constitute "double recovery" to the United States. This is an issue of first impression for our court.

In *Emerson*, the defendant argued that the United States Postal Service and the United States Department of Justice were the same entity. 128 F.3d at 567. The *Emerson* court rejected this argument, finding that the Postal Service was a "distinct entity" from the Department of Justice because it is "an independent establishment of the executive branch," while the Department of Justice "is an executive department." *Id.* at 567-68 (citations omitted).

We find that FEMA, an executive agency under control of the United States Department of Homeland Security, is a distinct entity from the Department of Justice. *See* 6 U.S.C. § 313 *et. seq.* FEMA, under direction of its own administrator, exists to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters . . . ." *Id.* at § 313(b)(1). "The Department of Justice is an executive department of the United States at the seat of Government," and is headed by the Attorney General. *See* 28 U.S.C. §§ 501, 503. The Department of Justice is tasked with representing the United States in all legal matters in

which the United States has an interest, as well as supervising and directing control over the various divisions and bureaus that comprise the Department. *See* 28 U.S.C. § 509. The district court's order of restitution and forfeiture against Taylor will not result in double recovery to the government and was therefore not an abuse of discretion.

We next address Taylor's argument that the amount of restitution he was ordered to pay should have been offset by the amount he was ordered to forfeit. Although the MVRA does not specifically address the relationship between restitution and forfeiture, it does address the relationship between restitution and other sources of funds generally. "In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B). Several courts have found that the plain language of the MVRA does not require that restitution be offset against amounts forfeited to the government. In *United States v. Alalade*, 204 F.3d 536 (4th Cir. 2000), the court was tasked with determining whether the district court had discretion under the MVRA to order the defendant to pay restitution in an amount less than the full amount of the victim's loss by allowing an offset for the amount of forfeiture. *Id.* at 537. The *Alalade* court held that "the plain language of the MVRA did not grant the district court discretion to reduce the amount of restitution" by the amount ordered to be forfeited. *Id.* at 540.

> [T]he MVRA's prohibition on district courts from considering the fact that a victim has received or is entitled to receive compensation for its loss from an insurance company or any other source in determining the total amount of restitution to be ordered . . . further evinces congressional intent that defendants such as Alalade initially be ordered to pay restitution in the full amount of each victim's loss. If the MVRA prohibits district courts from reducing the amount of restitution by the amount of third-party compensation received by

13

> a victim prior to entry of the district court's order of restitution, it would be nonsensical for the district court to have discretion to reduce the amount of restitution by the value of property seized from the defendant and retained by the government in administrative forfeiture, a loss to the defendant.

*Id*; *see also United States v. Bright*, 353 F.3d 1114, 1124 (9th Cir. 2004) ("[T]he MVRA instructs district courts on how they must calculate restitution when funds are made available to the victims from other sources and significantly restricts the circumstances in which a district court may offset other funds against the amount of a restitution order.") (citing §§ 3664(f)(1)(B), (j)(1)–(2)); *United States v. Leon-Delfis*, 203 F.3d 103, 116 (1st Cir. 2000) ("[T]he language of the . . . statutes regarding restitution is plain and allows the district court no discretion."); *Emerson*, 128 F.3d at 566-67 (holding that the district court has the statutory authority to impose both restitution and forfeiture, and there is no legal authority to offset one from the other) (discussing *Various Computers*, 82 F.3d at 586-89).

Courts have also declined to offset restitution based on the distinct purposes served by restitution and forfeiture. *See United States v. Hoffman-Vaile*, — F.3d — , 2009 WL 1458567, at *9 (11th Cir. May 27, 2009) (rejecting defendant's argument that forfeiture to government should be offset by the amount paid in restitution to victims, because "[a]lthough this might appear to be a double dip, restitution and forfeiture serve different goals") (quotation omitted); *see also United States v. Leahy*, 464 F.3d 773, 793 n.8 (7th Cir. 2006); *United States v. Hatten*, 2009 WL 29407, at *2 (S.D. Tex. Jan. 5, 2009).

Generally, courts decline to offset restitution when there is no evidence that doing so would result in double recovery to the victim. *See United States v. Ruff*, 472 F.3d 1044, 1047 (8th Cir. 2007) (rejecting offset because the proceeds

from confiscated items were not shown to have been paid to the victim); *Bright*, 353 F.3d at 1123 ("[T]he MVRA provisions . . . make clear that funds the victims have *not* received cannot reduce or offset the amount of losses the defendant is required to repay."); *United States v. Doe*, 374 F.3d 851, 856 (9th Cir. 2004) (rejecting the offset claim because the defendant did not allege that any forfeiture proceeds were actually distributed to victims); *United States v. Ellis,* 161 F. App'x 17, 19 (D.C. Cir. 2005) (unpublished) (because the victims were not the same, "requiring an off set would improperly allow [the defendant] to use the proceeds of a successful criminal venture to offset losses from an unsuccessful one"). Courts that permit offset of restitution have done so only after finding that forfeited funds have been remitted to the victims in lieu of restitution. *See United States v. Fore*, 169 F.3d 104, 110 (2d Cir. 1999); *United States v. Smith*, 297 F. Supp. 2d 69, 72-73 (D.D.C. 2003) (finding that when funds forfeited to the Government have been returned to the victim, they must be offset against the amount of restitution due; otherwise there would be a double recovery); *United States v. Anderson*, 85 F. Supp. 2d 1084, 1103 (D. Kan. 1999) (holding that funds recovered in a civil suit by the Federal Government against violators of the Medicare Anti-Kickback statute should be credited against the loss incurred in a Medicare fraud).

Finally, no rule or statute specifically requires this court to order the government to remit the forfeited funds to pay for Taylor's restitution obligation.

> Nothing in the MVRA indicates that district courts themselves are required to reach out and order the government to transfer forfeited funds from government entities to victims. If anything, there is some indication to the contrary. *See* § 3664(p) (no restitution provision 'shall be construed to create a cause of action not otherwise authorized in favor of any person against the United States or any officer or

employee of the United States.'). Thus, there is no legal
obligation that would compel the district court to invoke
its Article III enforcement authority.

*Bright*, 353 F.3d at 1124. Although the the Attorney General "is authorized . . . to transfer [forfeited] property on such terms and conditions as he may determine . . . as restoration to any victim," 18 U.S.C. § 981(e)(6), there is no evidence that the victims of Taylor's criminal conduct have received any of the forfeited funds or other restitution payments. As such, Taylor is not entitled to have the restitution obligation shown as satisfied or reduced.[1] Accordingly, the district court did not err in not offsetting Taylor's restitution obligation by the amount he was required to forfeit.

### III. Conclusion

For the foregoing reasons, we AFFIRM Taylor's conviction and sentence, and AFFIRM the district court's entry of an order of restitution and order of forfeiture.

AFFIRMED.

---

[1] In its brief to the court, the government stated that FEMA would only receive the forfeited funds if the Attorney General orders the money be remitted to FEMA in lieu of restitution, citing 21 U.S.C. § 853(h)(i)(1), and if this occurs, Taylor would "be entitled to reduce his restitution obligation by the amount of forfeited funds remitted to FEMA."