# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 20, 2012

No. 11-50326

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

ERNESTO ALONSO LOPEZ, also known as Ernie Lopez,

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:08-CR-1698-3

Before DAVIS, OWEN, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Ernesto Lopez appeals from his convictions for making a false statement and conspiracy to make a false statement in violation of 18 U.S.C. §§ 371 and 1001. The district court found that Lopez's conduct resulted in $86 million in losses and sentenced Lopez to 36 months imprisonment, a downward departure

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-50326

from the Guidelines range. Lopez argues that the evidence was insufficient to support the jury's verdict. He also challenges his sentence, arguing that the district court erred in finding that any loss resulted from his conduct and in computing such a loss. We AFFIRM.

FACTUAL AND PROCEDURAL HISTORY

Lopez was employed as Chief Operating Officer of the National Center for the Employment of the Disabled ("NCED") from 2002 through April 2006. NCED participated in a program created by the Javits-Wagner-O'Day ("JWOD") Act. The program is designed to provide for the employment of disabled individuals by designating federal contracts to be performed by nonprofits that employ people who are blind or severely disabled. NCED's participation in this program resulted in contracts with several federal agencies.

The Committee for Purchase from People Who are Blind or Severely Disabled ("the Committee") is the government agency responsible for overseeing the JWOD program. Products that can be manufactured by the blind or severely disabled are placed on a procurement list by the Committee. Once a product is on the procurement list, the government entity must purchase that product from the nonprofit designated by the procurement list.

For a nonprofit to qualify under JWOD, 75% of direct-labor hours must be performed by individuals who are severely disabled. Documentation, including a medical diagnosis that an individual is prevented from engaging in competitive employment, is necessary to support that an individual is "severely disabled."

The regulations require an annual certification, Committee Form 404, upon which the Committee relies to determine that the nonprofit is meeting the requirements of the program. Each quarter, nonprofits submit the percentage of direct-labor hours performed by severely disabled employees to NISH,[1] an

---

[1] "NISH" apparently is the formal name of the entity, having abandoned its former name of the National Institute for the Severely Handicapped in favor of the acronym.

No. 11-50326

intermediary between the Committee and the nonprofits. NISH compiles this quarterly data to generate the Form 404 to be certified by the nonprofits annually. If the nonprofit believes the numbers on the form are accurate, the officers sign and return it. NISH then reviews the form and sends it on to the Committee.

As Chief Operating Officer, Lopez signed NCED's Form 404 for the years 2003, 2004, and 2005. In compiling its quarterly numbers that were part of its annual certification, NCED combined the labor hours worked by disabled employees with its disadvantaged employees and reported all hours as performed by disabled employees. Lopez was aware of the practice and signed certifications regarding the percentage of disabled employees using this method.

In June 2005, an employee for the Committee, Lou Bartalot, met with Lopez, NCED Chief Executive Officer Bob Jones, and the NCED human resource manager. At this meeting, Lopez was told that it was improper to combine disadvantaged employees with disabled employees in the hours reported to the government. Jones told Bartalot that NCED believed many disadvantaged employees were also disabled. Bartalot explained that JWOD required medical documentation of disabilities. The Committee informed Jones that NCED would need documentation that the individuals counted were severely disabled and requested NCED adjust its 2005 and 2004 ratios. Bartalot expected the documentation could take several months.

In October 2005, the NCED's Human Relations manager sent Lopez the Form 404 for his signature and explained that the total still included disadvantaged employees. Lopez signed the form as presented to him. When Bartalot received the annual certification, he noticed the numbers were similar to the numbers he saw in June. Because Bartalot found NCED's numbers "highly suspect," he took the issue to his boss.

3

No. 11-50326

As a result, Bartalot and two other individuals traveled to NCED to review enough files to be "statistically certain as to whether or not the ratio was above or below 75 percent." When Bartalot determined that NCED was significantly below the 75% requirement, a full review of NCED's files was conducted. The review revealed that only 9% of direct-labor hours were performed by employees with adequate documentation. The Committee then took action and set September 2006 as the deadline for NCED to come into compliance. Ultimately, NCED reduced its workforce to come into compliance and changed its name to ReadyOne.

In 2008, Lopez, Jones, and an NCED board member were indicted in the United States District Court for the Western District of Texas. Lopez was charged with 17 counts involving his employment at NCED. The jury returned a verdict of guilty on two counts: Count 14, which charged Lopez with conspiracy to make false statements and defraud the United States, and Count 17, which charged Lopez with making a false statement in Form 404 on October 31, 2005.[2]

DISCUSSION

On appeal, Lopez argues that the evidence was insufficient to prove two of the elements of making a false statement: (1) the statement was material, and (2) an intent to deceive the Committee in making the statement. Lopez also contends there was error regarding the determination of loss.

I.    *Materiality*

We review the denial of a motion for judgment of acquittal *de novo. United States v. Richardson*, 676 F.3d 491, 501 (5th Cir. 2012). In a challenge to the sufficiency of the evidence, the court views the evidence "in the light most

---

[2] Beside Count 14, on the verdict form the jury wrote "making a false statement." Although the conspiracy charged conduct from 2002 through 2005, the parties focus their argument on evidence related to the October 2005 certification. We will do the same.

4

No. 11-50326

favorable to the government with all reasonable inferences and credibility choices made in support of a conviction." *United States v. Najera Jimenez*, 593 F.3d 391, 397 (5th Cir. 2010) (quotation marks and citation omitted). The court will affirm the conviction if the evidence "allows a rational fact finder to find every element of the offense beyond a reasonable doubt." *Id.* (quotation marks and citation omitted).

To obtain a conviction under 18 U.S.C. § 1001, the government must prove that Lopez knowingly and willfully made a statement to a federal agency that was false and material. *United States v. Taylor*, 582 F.3d 558, 562 (5th Cir. 2009). A statement is material if it has "a natural tendency to influence or be capable of influencing the decision of the decisionmaking body to which it was addressed." *United States v. Abrahem*, 678 F.3d 370, 374 (5th Cir. 2012) (quotation marks and citation omitted). "Actual influence is not required – a statement can be ignored or never read and still be material – and the statement need not be believed." *Id.*

In determining whether a false statement is material, the first step is to ask two "questions of purely historical fact: (a) what statement was made? and (b) what decision was the agency trying to make?" *United States v. Gaudin*, 515 U.S. 506, 512 (1995) (quotation marks omitted). Finally, to determine whether the statement is material we must apply the legal standard of materiality to these facts. *Id.*

A.   *Questions of Historical Fact*

Both parties agree that the answer to the first question is straightforward: the statement is the certification that NCED had a 75% or greater percentage of direct-labor hours performed by people with severe disabilities.

Lopez recognizes that in the ordinary course of administration, the decision the Committee is trying to make is whether the agency is eligible to participate in the JWOD program. Lopez argues, however, the Committee was

5

not making any decision based upon the 2005 Form 404 because the Committee already knew NCED was not in compliance. Lopez points to evidence that Bartalot knew in June 2005 that NCED was improperly combining employee hours and knew that the past reports on which the Form 404 was based had not been corrected.

Bartalot testified that prior to receiving the Form 404 certification, he believed NCED was performing physicals and was readjusting its ratio. After his visit in June, Bartalot thought "it was possible to work things out" with NCED. After observing the similarity in numbers in the 2005 Form 404, Bartalot testified that if he believed "Mr. Jones that a majority of the people that were disadvantaged were also severely disabled, that might be possible. But for it to be exactly the same or as close . . . was highly unlikely." Bartalot also testified that NISH was aware of NCED's method of combining disabled and disadvantaged employees and had performed compliance training as recently as September 2005. Bartalot stated that he would have expected NISH to do a review before they approved the annual certification.

Bartalot's testimony reflects his knowledge of past inaccuracies and belief that NCED was conducting physicals and documentation to correct past reports. The jury could reasonably infer that, despite past false statements, the Committee was trying to decide whether NCED was in compliance with the requirements of the JWOD program and, if not, whether probation and ultimately expulsion was necessary.

*B.   Applying the Legal Standard*

Once the court answers the two questions of historical fact, we apply the legal standard. *See Najera Jimenez*, 593 F.3d at 399-400. We now must decide whether Lopez's statement that more than 75% of direct labor hours were performed by disabled employees was capable of influencing the Committee's decision as to whether NCED was in compliance with the JWOD program.

Lopez concedes that generally the certification is material because it is the representation upon which the Committee relies to determine eligibility for JWOD contracts.  In this case, however, Lopez argues that the statement was not material because a statement known to be false is not capable of influencing the Committee's decision.  That is not so.

We have made "clear that the subjective knowledge of an agent or agency that a statement is false does not factor into the materiality analysis."  *Id.* at 400.  "Instead, we ask whether the functioning of the federal agency would have been impaired had the agency relied on the defendant's statement."  *Id.* (quotation marks and citation omitted).  Had the Committee relied on Lopez's representation, it could have decided NCED was eligible to participate in the program without the knowledge that NCED had failed to conduct physicals and correct its reporting errors.  *See id.*  Further, NCED could have continued receiving contracts and operating without additional measures imposed in March 2006.

The evidence was sufficient to support the jury's finding of materiality. We now turn to whether there was evidence of the necessary intent.

## II.     *Intent to Mislead*

"A false representation is one made with an intent to deceive or mislead." *United States v. Shah*, 44 F.3d 285, 289 (5th Cir. 1995) (quotation marks and citation omitted).  A false statement is made knowingly and willingly "if the defendant acts deliberately and with the knowledge that the representation is false."  *United States v. Guzman*, 781 F.2d 428, 431 (5th Cir. 1986).  Again, we view all the evidence in the light most favorable to the verdict.  *United States v. Harris*, 666 F.3d 905, 907 (5th Cir. 2012).

Lopez argues that there is no evidence he intended to deceive the Committee because the evidence demonstrates he believed the Committee knew

how NCED was reporting its hours and that he was open and honest throughout the process.  Lopez argues that the evidence demonstrates there was no possibility he intended to mislead anyone.

Lopez testified that he had been told not to combine the disadvantaged and the disabled numbers prior to signing the 2005 Form 404, that he knew that disadvantaged employees were included in the form, that he knew the 2005 Form 404 should have reported the true number of disabled employees, and that he signed the 2005 Form 404 confirming that the report represented the percentage of hours performed by disabled employees.  He also testified that he knew there would probably be some questions if the form reported a number less than the 75% of direct-labor hours.

Although Lopez testified that he believed the Committee knew that the 2005 percentage was computed by combining disabled and disadvantaged employees when he signed the form, there was also evidence that he had signed the form because "that's what Mr. Jones wanted."  A reasonable jury could conclude that Lopez intended to deceive the Committee in signing the form.

## III.   *Determination of Loss*

The district court determined that a special rule for government benefits applied in this case.  This rule provides that "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses."  U.S.S.G. § 2B1.1 cmt. n.3(F)(ii).  The district court found that because NCED did not meet the 75% threshold, it was an "unintended recipient" of JWOD contracts.  Further, the district court found that Lopez should be accountable for the contracts from the time of the certification in October 2005 through March 2006 when the false statement was discovered.

We review the district court's method for determining loss *de novo* as an application of the Guidelines.  *United States v. Harris*, 597 F.3d 242, 250-51 (5th

Cir. 2010).   "Factual determinations regarding loss amount for guideline calculation purposes are reviewed for clear error."   *Taylor*, 582 F.3d at 564 (quotation marks and citation omitted).

Lopez first argues that the district court erred in determining that any loss resulted from his conduct and, to the extent there was any loss, the district court erred in computing its amount.  Specifically, Lopez contends the government did not present evidence that any contracts were awarded in reliance on the 2005 Form 404, that the certification only serves as the basis for continued participation in the JWOD program, and that the contract was not cancelled even after Lopez's false statement was fully documented.

The district court heard evidence that once the Committee confirmed that NCED was not in compliance in March 2006, it required NCED to take steps to come into compliance.  Ultimately, NCED downsized and transferred a number of contracts to a related corporation to comply with the Committee's requirements.  Lopez's certification enabled NCED to remain in the JWOD program at its original levels before the Committee imposed these measures.  Thus, the district court did not clearly err in determining that the false statement allowed NCED to obtain benefits to which it was not entitled.

If any loss resulted from his conduct, Lopez argues that the district court erred in determining that loss to be the face value of the contracts.  Lopez contends that loss should be computed by a price-variance method where the court subtracts the price the government would pay a commercial provider from the price the government paid NCED under the JWOD contract.

The Application Note 3 to Section 2B1.1 states that, "Notwithstanding subdivision (A)" – which is the "General Rule" for calculating loss in this case – certain "special rules shall be used to assist in determining loss in the cases indicated."  U.S.S.G. § 2B1.1 cmt. n.3(F); *see United States v. Tupone*, 442 F.3d

145, 154 n.7 (3d Cir. 2006).  One of the special rules is the government-benefits rule at issue here.

The Guidelines do not define "Government Benefits."  Decisions from our sister circuits provide useful analysis.  The Eighth Circuit held that a district court properly applied the government-benefits rule where a defendant used funds from a government program dedicated to asbestos removal to perform renovations unrelated to asbestos removal.  *United States v. Peters*, 59 F.3d 732, 733 (8th Cir. 1995).  The Seventh Circuit described contracts received under a municipal ordinance directing contracts to "minority- and woman-owned businesses" as a government benefit.  *United States v. Leahy*, 464 F.3d 773, 790 (7th Cir. 2006)

The Eleventh Circuit described the Disadvantaged Business Enterprises ("DBE") program as an "affirmative action program[] aimed at giving exclusive opportunities to certain women and minority businesses," and as such was a government-benefit program.  *United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009); *see also United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300, 317-18 (4th Cir. 2000) (applying the government-benefits rule in a case involving contracting with a DBE).  The court concluded that unlike standard construction contracts, DBE "contracts focus mainly on who is doing the work." *Maxwell*, 579 F.3d at 1306.

Contracts obtained through the JWOD program can be distinguished in the same manner: the focus in the JWOD program is on providing employment opportunities for the severely disabled, not on the specific product or service provided. The district court did not err in applying the government-benefits rule in this case and declining to use the price-variance method urged by Lopez.

Although the district court did not err in applying the government-benefits rule, it failed to exclude the benefits that reached intended beneficiaries.  The government-benefits rule was revised in 2001 "to clarify that loss . . . only

includes amounts that were diverted from intended recipients or uses," not amounts received by authorized persons. U.S.S.G. app. C vol. II, at 180 (2010). "[I]f such benefits flowed through an unauthorized intermediary, as long as they went to intended recipients for intended uses, the amount of those benefits should not be included in loss." *Id.* at 180. Because nine percent of NCED's direct labor hours were performed by the severely disabled, Lopez should not be responsible for the funds that benefitted the severely disabled.

Although the district court should have excluded the portion of the funds that did in fact reach intended recipients, this exclusion would not result in a lower offense level. The 24 level enhancement applies where loss is more than $50 million but less than $100 million. *See* U.S.S.G. § 2B1.1(b)(1)(M). A deduction for the funds attributable to the benefits obtained by intended recipients would not result in a lower Guidelines range and therefore is harmless. *See Taylor*, 582 F.3d at 564-65.

We AFFIRM.