# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 22, 2013

Lyle W. Cayce
Clerk

No. 11-60828

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMES SMITH,

Defendant - Appellant.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:10–CR–53–1

Before HIGGINBOTHAM, SMITH, and ELROD, Circuit Judges.

PER CURIAM:[*]

James Smith appeals his conviction based on 18 U.S.C. § 1001, which prohibits, among other things, making "any materially false . . . statement or representation" in "any matter within the jurisdiction" of the United States government. § 1001(a)(2). Smith contends that his conduct was not punishable under § 1001 because it did not fall within the jurisdiction of the United States government or materially influence an authorized governmental function. We conclude that sufficient evidence supports the jury's verdict and, therefore, AFFIRM the district court's judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-60828

I.

This case involves Smith's alterations to certain commercial driver's license ("CDL") holders' driving records, which are part of the federally-established Commercial Driver's License Information System ("CDLIS"). *See* 49 U.S.C. § 31309. Established at Congress's direction, the CDLIS "serve[s] as a clearinghouse and depository of information pertaining to the licensing and identification of operators of commercial motor vehicles and the disqualification of such operators from operating commercial motor vehicles." Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, title XII, § 12007, 100 Stat. 3207–175 (1986) (codified as amended at 49 U.S.C. § 31309(a)). The Federal Motor Carrier Safety Administration ("FMCSA"), a division of the Department of Transportation, is responsible for the development and oversight of the CDLIS. *See* 49 U.S.C. § 113; 49 C.F.R. § 384.225. Robert Redmond, an FMCSA specialist who testified as an expert at trial, explained that the CDLIS is a national computer-based system in which states input the records of their CDL-licensed drivers. If a state chooses to participate in the CDLIS—as all states and the District of Columbia currently do—it must comply with certain minimum standards or risk losing up to ten percent of its federal highway funding. *See* 49 U.S.C. §§ 31309, 31311(a), 31314. FMCSA periodically audits states' compliance with the minimum standards. *See* 49 C.F.R. §§ 384.225, 384.301, 384.307.

FMCSA has an agreement with and provides funds to the American Association of Motor Vehicle Administrators ("AAMVA") to operate the CDLIS network. AAMVA also issues the CDLIS State Procedures Manual (the "Manual"), which the federal regulations incorporate, *see* 49 C.F.R. § 384.107, and the Code Dictionary ("ACD"), which states use to translate traffic offense

No. 11-60828

convictions into a uniform format. *Cf.* 23 C.F.R. Pt. 1327, App. A (setting out an abridged listing of the AAMVA codes). Together, the Manual and ACD set forth the information that states must enter into the CDLIS, such as a jurisdiction code, offense code, and the date and state in which a CDL-holder was cited for and convicted of a traffic violation. This information helps ensure that the CDLIS accurately reflects the driving records of CDL-holders.

FMCSA uses a points system in the CDLIS with four categories of disqualifying offenses, that is, traffic violations for which a person may have his CDL license suspended or removed. Some offenses result in a loss of points only if the CDL holder was driving a commercial vehicle, while others carry a penalty even if the CDL holder was driving a noncommercial vehicle. Redmond testified that, "[i]n many states, including Mississippi, if the person who has a CDL is driving a noncommercial vehicle and that offense is considered in that state to be a disqualifying offense, it does become a serious traffic violation and count against the CDL record." Redmond further explained that serious traffic violations include driving more than fifteen miles per hour over the speed limit, making erratic lane changes, or driving recklessly. These violations carry a penalty of 60 to 120 days of CDL disqualification.

Mississippi participates in the CDLIS through the Mississippi Department of Public Safety (the "Department"). From 2005 to 2010, Smith served as the Director of Driver Records for the Department. In that role, Smith was responsible for overseeing the records of persons holding CDL licenses and had the ability to access and change driver records. Certain tips led law enforcement to investigate Smith's conduct and a grand jury ultimately charged him with violating 18 U.S.C. §§ 1001 and 1002 by falsifying information in seven CDL

3

No. 11-60828

holders' driving records. Smith moved to dismiss the indictment "for lack of Federal jurisdiction over the conduct . . . as alleged in the Indictment." The district court denied Smith's motion, concluding that Smith's jurisdictional argument presented "a question of fact."

The case proceeded to a five-day jury trial. The government introduced computer records and testimony to show that Smith altered:

- Robert Rawls's driving record, by changing Rawls's speeding conviction from eighty-two miles per hour to seventy-two miles per hour in a sixty-five mile-per-hour zone;

- Larry Parker's driving record, by not only changing a speeding conviction from eighty-one miles per hour to seventy-one miles per hour in a sixty-five mile-per-hour zone, but also deleting a code intended to denote that Parker was convicted of two serious driving offenses within a three-year period;

- Delman Davis's driving record, by not only changing a speeding conviction from forty miles per hour to thirty-five miles per hour in a twenty-five mile-per-hour zone, but also deleting a code intended to denote that Davis was convicted of three serious driving offenses within a three-year period; and

- Ance Cascio's driving record, by changing guilty dispositions for speeding and running a stop sign to show that Cascio attended defensive driver's school, which had the effect of removing a notation that Cascio's license was suspended.

The jury heard testimony that Cascio was an acquaintance of Smith's, and that the alterations to Rawls and Parker's CDL records occurred shortly after one of their relatives—a former state trooper with whom Smith once worked—contacted Smith about the violations.[1]

_____

[1] The government also introduced testimony in support of one count for changing Leslie Lampton's driving record to show "not guilty" on a speeding citation rather than "pending disposition," and two counts for adding a Passenger Endorsement to Joseph Pierce and Barry McCool's CDL licenses even though they did not complete the examination necessary for that

4

No. 11-60828

The government also introduced testimony to show that Smith's actions fell "within the jurisdiction" of the United States government, as required for liability under 18 U.S.C. § 1001. Redmond testified that FMCSA not only audits states' compliance with federal standards, but also provides grant funds to help states develop and improve their driver's license databases. Testimony from the Department's employees was consistent with Redmond's account. For example, the computer programmer in charge of maintaining the Department's driver's license database acknowledged that the database is "federally mandated" and "hooked up to the federal system," observing that one of her responsibilities was to "make sure that our programs are in federal compliance." The programmer also testified that FMCSA audited the Department's database in 2004 and 2007, requiring her to take corrective action on each occasion. Finally, two Department employees, including Smith, testified that in 2008 the Department applied for and received federal funds to deal with a backlog of CDL tickets.

At the close of the government's case-in-chief, Smith moved for acquittal. He asserted that the evidence was insufficient to show that his actions fell "within the jurisdiction" of the United States government or were material. The district court denied the motion and Smith proceeded to present his defense.

Smith acknowledged that he altered the speeding records for Rawls, Parker, and Davis, but testified that he did so only to restore driving privileges that he thought had been wrongfully suspended. According to Smith, tickets involving speeds greater than fifteen miles per hour over the speed limit should not have resulted in CDL disqualification, but such disqualifications were occurring. Smith denied making any changes to Cascio's driving record.

---

endorsement. The jury ultimately found Smith not guilty on these counts.

No. 11-60828

After the close of the evidence, Smith once again moved unsuccessfully for a judgment of acquittal.  The jury found Smith guilty on four counts, and the district court sentenced him to three year's probation and ordered him to pay a $400 special assessment.  Smith timely appealed.

## II.

We review *de novo* the district court's denial of a properly preserved motion for judgment of acquittal.  *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012) (citing *United States v. Campbell*, 52 F.3d 521, 522 (5th Cir. 1995)).  Our "[r]eview is 'highly deferential to the verdict,' asking 'whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt.'" *United States v. Richardson*, 676 F.3d 491, 501 (5th Cir. 2012) (quoting *United States v. Najera Jimenez*, 593 F.3d 391, 397 (5th Cir. 2010)).  Therefore, "[a] motion for acquittal should be granted if the government fail[ed] to present evidence sufficient for a reasonable jury to have found that each essential element of the offense was established beyond a reasonable doubt." *Vasquez*, 677 F.3d at 692 (citing *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998)).

## III.

Smith contends that there is insufficient evidence to sustain his conviction based on 18 U.S.C. § 1001(a).  Section 1001(a) imposes criminal liability on "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2).  Under this provision, the government must prove five elements to obtain a conviction: "(1) a statement, (2) falsity,

No. 11-60828

(3) materiality, (4) specific intent, and (5) agency jurisdiction." *United States v. Montemayor*, 712 F.2d 104, 106 (5th Cir. 1983) (quoting *United States v. Baker*, 626 F.2d 512, 514 (5th Cir. 1980)).

Smith contests only two elements of his charge: agency jurisdiction and materiality. We conclude that both of his arguments are unpersuasive.

A.

Smith first asserts that his actions did not fall "within the jurisdiction" of the United States government because FMCSA has no authority to take any action with respect to data entered into a state database connected to the CDLIS, nor any power to punish persons who make fraudulent entries. In support of his argument, Smith largely relies on cases from outside our circuit.[2] The government responds that this case is distinguishable from the cases Smith relies on and his conviction is proper under our decision in *United States v. Taylor*, 582 F.3d 558, 562–64 (5th Cir. 2009). We agree that this case falls within *Taylor*.[3]

---

[2] In particular, Smith focuses on a Ninth Circuit decision that the Sixth Circuit has followed. *See United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989) (en banc) (interpreting the jurisdictional limitation in § 1001 to require a "direct relationship" between a false statement and an authorized federal governmental function, and reversing a § 1001 conviction based on a false statement made to a state unemployment insurance agency because the Department of Labor had no authority to act on information provided to the state agency or punish individuals who furnished false information); *United States v. Holmes*, 111 F.3d 463, 466 (6th Cir. 1997) (adopting the Ninth Circuit's reasoning to reach the same conclusion on essentially the same facts).

[3] Smith's reliance on *Facchini* and *Holmes* is unavailing. First, even if we found Smith's argument compelling, we are bound by our precedent unless a decision of the Supreme Court or this court sitting *en banc* overrules it. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) (citation omitted). Moreover, one of our sister courts has explicitly rejected the reasoning in *Facchini*, which *Holmes* adopted. *See United States v. Herring*, 916 F.2d 1543, 1546 (11th Cir. 1990) (rejecting "the Ninth Circuit's narrow and technical definition of section 1001 jurisdiction"). Finally, although we need not pass on whether *Holmes* and *Facchini* are good law, we note that their reasoning—namely, that jurisdiction in § 1001 means that "a *direct relationship* obtains between the false statement

7

No. 11-60828

We recognized in *Taylor* that a false statement may fall "within the jurisdiction" of a federal agency if it has the potential to "contravene[] the intent" of an agency program. *See id.* at 563–64. There, a defendant made false statements to a state disaster relief agency to wrongfully access funds that a federal agency furnished. *Id.* at 561. A jury found the defendant guilty under § 1001(a)(2) and he appealed, contending in part that his false statement did not satisfy the jurisdictional element because he made the statement to a state agency with limited federal oversight. *Id.* at 562. We construed the defendant's argument as "a challenge to the sufficiency of the evidence establishing a nexus between his statements to the [state agency] and the administration of the grant by [the federal agency]." *Id.* In upholding the defendant's conviction, we determined that the defendant's statements "contravened the intent" of the state program and "had the potential to divert a portion of the[] funds from an individual who was entitled to receive them." *Id.* at 563–64. Therefore, even though the federal agency had no direct authority over disbursement of the funds and no power to punish individuals making fraudulent claims, the defendant's false statements affected a "matter within the jurisdiction" of a federal agency for the purposes of § 1001. *Id.* at 564.

Here, viewing the evidence in the light most favorable to the government, a reasonable juror could have concluded that Smith's data manipulation contravened the intent of FMCSA's CDLIS information-sharing program and, therefore, fell within FMCSA's jurisdiction. *See id.* at 563. The jury heard

---

and an authorized function of a federal agency," *Facchini*, 874 F.2d at 641 (emphasis added)—appears to be in some tension with pronouncements from the Supreme Court. *See, e.g.*, *United States v. Rogers*, 466 U.S. 475, 479 (1984) (explaining that "[t]he most natural, nontechnical reading of the statutory language [in § 1001] is that it covers *all matters confided to the authority of an agency or department*" (emphasis added)); *Bryson v. United States*, 396 U.S. 64, 70–71 (1969) (directing that "the term 'jurisdiction' *should not be given a narrow or technical meaning* for purposes of § 1001" (emphasis added) (citations omitted)).

No. 11-60828

Redmond's unchallenged expert testimony that Mississippi's driver's license database is connected to the CDLIS and subject to FMCSA regulations and audits. The Manual and ACD, which the defendant filed as exhibits at trial, further demonstrate the scope of FMCSA's authority and its particular interest in the data manipulation at issue. For example, the Manual provides that participating states "must record all ACD convictions" for every CDL holder. Def. Ex. 17 at 137; *see also* 49 C.F.R. § 384.107. The ACD, in turn, provides detailed guidance on which convictions states must record, as well as how states must code those convictions when entering them into their databases. Def. Ex. 21. FMCSA regulations also prohibit states from "prevent[ing] a . . . CDL holder's conviction for any violation . . . from appearing on the CDLIS driver record," yet the government introduced evidence suggesting that Smith deleted Cascio's convictions for speeding and running a stop sign. 49 C.F.R. § 384.226; *see also* 49 C.F.R. § 384.225(a)(1) (specifying that states must "[p]ost and maintain as part of the CDLIS driver record . . . [a]ll convictions, disqualifications and other licensing actions for violations of any State or local law relating to motor vehicle traffic control . . . ."). The ACD's coding regime for speeding violations also differentiates between different driver speeds and Smith admitted he altered the speeds on Rawls's, Parker's, and Davis's speeding violations.[4]

Furthermore, Smith's own testimony implicates our prior observation that a "showing that the defendant had actual knowledge of federal involvement might lessen the need for a detailed examination of the federal government's relationship to the statements." *Taylor*, 582 F.3d at 563 (quoting *Montemayor*,

---

[4] Mississippi reports speeding violations using ACD code "S92," which requires detailed information about the "[s]peed limit and [the driver's] actual speed." *Cf.* 23 C.F.R. Pt. 1327, App. A.

No. 11-60828

712 F.2d at 108). Smith testified that "the Federal Motor Carrier people came in and held an audit . . . [in] early fall of '07," that they "threatened to take away" Mississippi's highway funds "every time they c[a]me in and d[id] an audit," and that "[s]ometime around July of '08, there was a mass rush to get the computer programmed just to be able to handle how the commercial driver's license tickets were supposed to be done according to the Federal Motor Carrier people." This testimony shows that Smith was keenly aware of FMCSA's involvement in Mississippi's driver's license database when he engaged in the data manipulation at issue.

We reject Smith's attempts to distinguish this case from *Taylor*. At oral argument, Smith's counsel emphasized that in *Taylor* the federal agency had the authority to rescind the state program at issue, suggesting that the circumstances here are different. But the federal regulations provide that if a state is in "substantial noncompliance" with federal regulations—by, for example, "not disqualify[ing] drivers convicted of disqualifying offenses in commercial motor vehicles"—then FMCSA may decertify the state's CDL program. 49 C.F.R. § 384.405(b)(2), (d), (e); *see also id.* § 384.225 (establishing minimum standards for compliance with CDLIS driver recordkeeping). Moreover, just as the federal agency in *Taylor* audited and provided funding for the state program, FMCSA audits Mississippi's driver's license database for compliance with CDLIS standards and, according to Redmond's expert testimony, FMCSA provides grant funds for states to develop and improve the CDLIS. *See Taylor*, 582 F.3d at 562–63; *see also* 49 U.S.C. § 31313 (authorizing the Secretary of Transportation to make grants to implement and improve the CDLIS). Finally, AAMVA acting on behalf of FMCSA provides administrative support for states that participate in the CDLIS. Smith asserts that only FMCSA is relevant to the inquiry, not AAMVA, but our precedent holds

10

otherwise. *See Montemayor*, 712 F.2d at 107 (upholding a conviction under § 1001 based on false statements to procure Texas birth certificates even though the statements were not made directly to a federal agency); *see also United States v. Hames*, 185 F. App'x 318, 323–24 (5th Cir. 2006) (unpublished but persuasive) (concluding that a defendant's false statements to a private contractor administering the Medicare program in Texas were sufficient for a rational trier of fact to have found the defendant guilty of violating § 1001); *United States v. Reynolds*, 152 F. App'x 416, 417–18 (5th Cir. 2005) (unpublished but persuasive) (holding that a defendant's statements to private lenders in an attempt to acquire federally insured loans were matters within the federal agency's jurisdiction).

In sum, under our precedent and the evidence presented at trial, a reasonable trier of fact could have found that Smith's data manipulation fell "within the jurisdiction" of FMCSA for the purpose of § 1001.

B.

Smith next argues that the evidence is insufficient to sustain a finding that his actions were material, as required for a conviction under § 1001.  Once again citing *Holmes* and *Facchini*, Smith insists that his actions could not have affected or influenced FMCSA because FMCSA has no authority to act on information entered in the CDLIS or punish an individual who enters false information.[5]  In response, the government argues that Smith's conduct

---

[5] Smith also asserts that his changes to the driver records were not material because they did not affect core information in the CDLIS, such as jurisdiction and offense codes. Smith's position finds little support in the record.  For one, as noted above, Mississippi reports speeding violations using an ACD code for which the speed details are required. *See supra* n.4. Furthermore, aside from the code for speeding, the record reflects that Smith deleted from Parker and Davis's records codes "W30" and "W31," respectively, which served to show that the two men had been convicted of multiple serious traffic violations.   *Cf.* 23 C.F.R. Pt. 1327, App. A.  The government also points to evidence that Smith deleted two ACD convictions from Cascio's driving record, thereby removing the suspension of Cascio's license.  Nevertheless, our

No. 11-60828

materially undermined the purpose and function of the CDLIS system by impairing the accuracy of CDL records.[6]  Based on the evidence in the record, we conclude that a reasonable factfinder could have determined that Smith's data manipulation was material beyond a reasonable doubt.

We articulated the test for materiality in *United States v. Lichenstein*: "A material false statement under [§ 1001] is one that is capable of affecting or influencing the exercise of a government function." 610 F.2d 1272, 1278 (5th Cir. 1980).  This standard calls for "differentiat[ing] the official, authorized functions of an agency or department from matters peripheral to the business of that body." *Rodgers*, 466 U.S. at 479.  "The purpose of this 'judge-made limitation of materiality' is to ensure that the reach of § 1001 is confined to reasonable bounds and not allowed to embrace trivial falsehoods." *United States v. Elashyi*, 554 F.3d 480, 497 (5th Cir. 2008) (quoting *Lichenstein*, 610 F.2d at 1278).

Here, the testimony at trial was sufficient to show that Smith's data manipulation was capable of affecting or influencing FMCSA's exercise of at least one authorized governmental function, namely auditing Mississippi's compliance with federal standards for the CDLIS.  Redmond testified that

---

resolution of this issue does not turn on whether Smith's conduct affected the ACD codes. Even accepting Smith's argument, his data manipulation had the potential to frustrate FMCSA's official audit function, as we explain above.

[6] At oral argument, the government also seemed to argue that materiality under § 1001 may turn on whether the federal government "has an interest" in the defendant's conduct (and it had difficulty identifying any situation in which the federal government would not have such an interest).  In this day, the federal government may have an interest in almost anything, but federalism concerns prevent us from construing § 1001 so broadly. Well-established precedent makes clear that a defendant's conduct gives rise to criminal liability under § 1001 when it is material, *i.e.*, capable of affecting "the official, authorized functions of an agency or department." *Rodgers*, 466 U.S. at 479.  In the context of this case, Smith's data manipulation was material not because it impacted something in which the federal government has an interest, but because it was capable of affecting FMCSA's audit authority and falls within our precedent.  *See Taylor*, 582 F.3d at 563–64; *Lichenstein*, 610 F.2d at 1278.

12

No. 11-60828

FMCSA has "a stringent . . . compliance review program," pursuant to which it audits state databases every three to three and a half years to ensure that they meet the federally-mandated minimum standards.[7] He also explained that when a person inputs information in a database that is part of the CDLIS, "it affects [FMCSA] in the sense that Congress is providing [FMCSA] with money to oversee the [CDLIS] program and [FMCSA is] looking at the states themselves to make sure they are meeting the minimum requirements," including accurate and complete records of traffic violations. This testimony contradicts Smith's position that his false statements "don't have any connection with something that [FMCSA] does." Indeed, it shows that Smith's data manipulation was capable of affecting FMCSA's authorized auditing function. Accordingly, we conclude that the record contains sufficient evidence that Smith's actions were material.

IV.

For the foregoing reasons, we AFFIRM the district court's judgment.

---

[7] Mississippi's driver's license database has been subject to such audits. The Department's computer programer testified that FMCSA audited Mississippi's driver's license database in 2004 and 2007. Both of these audits resulted in corrective actions to bring Mississippi into compliance with federal requirements.