# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50106

United States Court of Appeals
Fifth Circuit

**FILED**

April 28, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

THOMAS GREGORY HARRIS,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, OWEN, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Colonel Thomas Gregory Harris was convicted on sixteen counts of wire fraud under 18 U.S.C. § 1343 in connection with a scheme to obtain government procurement contracts set aside by the Small Business Administration for minority-owned small businesses. Harris challenges his conviction, arguing it is not supported by sufficient evidence. Harris also challenges his sentence, arguing that his Guidelines range was calculated based on a loss amount that improperly accounted for the entire face value of the fraudulently obtained contracts. Under our extremely deferential standard of review, we conclude that sufficient evidence supports the jury's finding of guilt and therefore AFFIRM the conviction. However, because the

No. 15-50106

district court should have deducted from its sentencing loss calculation the fair market value of services rendered under the contracts by Harris and his company, we VACATE the sentence and REMAND for resentencing.

## I.

### A. The 8(a) Joint Venture Program

This case revolves around two government procurement contracts awarded through a program established under section 8(a) of the Small Business Act. Pub. L. No. 83–163, 67 Stat. 232 (1953). We begin by describing that program. Section 8(a) empowers the Small Business Administration ("SBA") to arrange for the fulfillment of other federal agencies' procurement needs through contracts with qualifying small businesses. 15 U.S.C. § 637(a)(1)(A)–(B). All federal agencies must set goals for awarding a percentage of their procurement contracts to 8(a)-qualifying firms. 15 U.S.C. § 644(g)(2). To qualify for these "8(a) set-aside" contracts, a small business must be owned and controlled by one or more "socially and economically disadvantaged individuals," *id.* § 637(a)(4), (a)(1)(C), a category defined to include certain racial minorities and members of other historically disadvantaged groups, *id.* §§ 631(f)(1)(B)–(C), 637(a)(5)–(6); 13 C.F.R. §§ 124.103, 124.104. The 8(a) program, in other words, is an affirmative action contracting program.[1]

To become eligible to receive 8(a) set-aside contracts, a firm must participate in the SBA's business development program or otherwise obtain SBA approval. 13 C.F.R. § 124.501(g). Once deemed eligible, an 8(a) firm can seek contracts either through the SBA or directly from the procuring agency. *Id.* § 124.501(d)–(e). Some awarded contracts are executed between the

---

[1] *See generally Rothe Dev., Inc. v. U.S. Dep't of Def.*, 107 F. Supp. 3d 183, 188–90 (D.D.C.), *appeal docketed*, No. 15-5176 (D.C. Cir. June 19, 2015); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 243–46 (D.D.C. 2012).

No. 15-50106

procuring agency and the 8(a) firm, while others include the SBA as a third party. *Id.* § 124.508(a). Contracts can be awarded under the 8(a) program either competitively among multiple eligible small businesses or non-competitively on a "sole source" basis. *Id.* § 124.501(b).

Where an 8(a) firm lacks capacity to perform a particular 8(a) set-aside contract on its own, it may enter into a joint venture agreement with a non-8(a) small business for the purpose of performing the contract. *Id.* § 124.513(a). The agreement must be approved by the SBA before any contracts are awarded to the joint venture, *id.* § 124.513(e), and the SBA's regulations warn that approval will be withheld where "an 8(a) concern brings very little to the joint venture relationship in terms of resources and expertise other than its 8(a) status," *id.* § 124.513(a)(2). Specifically, the agreement must provide that the 8(a) firm will serve as managing venturer, will control the performance of any contracts awarded to the joint venture, and will own at least 51% of the joint venture entity. *Id.* § 124.513(c)(2)–(3). Importantly for this case, the 8(a) firm must perform at least 40% of the work on any 8(a) set-aside contract awarded to the joint venture, and the joint venture agreement must detail how the parties will ensure that the labor-division requirement is met. *Id.* § 124.513(c)(7), (d).[2] An offer submitted to a procuring agency "must certify . . . that [the 8(a) firm] will meet the applicable performance of work requirement." *Id.* § 124.510(b). Both upon the completion of each contract and as part of its annual review, an 8(a) firm participating in a joint venture must explain to the SBA how the labor-

---

[2] As detailed below, the 40% labor division requirement became effective in March 2011. *Bus. Dev./Small Disadvantaged Bus. Status Determinations*, 76 Fed. Reg. 8222, 8242–44 (Feb. 11, 2011) (codified at 13 C.F.R. § 124.513(d)). Previously, SBA regulations required that the 8(a) firm complete "a significant portion" of the work on the contract but did not specify a percentage. *Id.*; 13 C.F.R. § 124.513(d) (1999).

No. 15-50106

division requirement was satisfied for each contract awarded to the joint venture. *Id.* § 124.513(i).

## B. Background

Defendant Thomas Gregory Harris, a retired U.S. Army colonel, worked for Luster National, a non-8(a) firm with experience performing large-scale defense contracts, as a project manager and later as senior vice president. Patricia Winters ("Patricia"), along with her husband Charles Winters ("Charles"), owned and operated Tropical Contracting, an SBA-approved 8(a) firm with experience in concrete work, excavation, and other construction-related projects. At the suggestion of a mutual acquaintance, Charles reached out to Harris in 2010 and arranged a meeting among Harris, Patricia, and Charles to discuss possible collaboration between Luster and Tropical in obtaining government contracts. At the meeting, Harris initially suggested that Luster provide Tropical with "project managers," but Patricia rejected that arrangement, suspecting that "it was going to be too expensive for [her] little business." Charles told Harris that Tropical "w[asn't] set up for that." At a later meeting attended by Patricia, Charles, Harris, and another Luster employee, Harris suggested that the two companies form a joint venture for the purpose of pursuing 8(a) contracts with different government entities. Harris proposed that the joint venture would provide project managers; Patricia testified at trial that she "liked the idea of that" and "agreed at that very moment," but acknowledged that, at the time, she "didn't understand that concept or that business exactly" and "didn't know, really, exactly, what these people exactly were going to do."

Tropical and Luster agreed to form Tropical Luster Joint Venture ("the Joint Venture"), and the two entities executed a joint venture agreement in March 2010. The agreement was created from a template that Patricia

4

downloaded from the SBA website and e-mailed to Harris[3] and was signed by Patricia and Robert Luster, the president of Luster National, but not by Harris. Per the agreement, the purpose of the Joint Venture was to bid on and perform "construction management" and "other professional services" contracts for divisions of the U.S. Army Corps of Engineers ("USACE"). The agreement expressly acknowledged that Tropical had "no prior experience in this area of business." Charles was designated as program director, responsible for "overall contract performance," and Harris was designated as program manager, responsible for overseeing the job-site and reporting to Charles—both designations having been suggested by Harris. Both Charles and Harris were designated as responsible for contract negotiations with procuring agencies. The agreement acknowledged both Tropical's and Luster's obligation to comply with all applicable federal laws and regulations. The agreement was submitted to the SBA and was approved in July 2010, with SBA representative Debra Dimando confirming that "[t]he firms meet the requirements of the regulations and the purpose of the Joint Venture cited at 13 C.F.R. Section 124.513."

Luster employee Les Hunkele testified that he had concerns about 8(a) regulatory compliance in light of Tropical's lack of relevant experience and expressed those concerns to Harris. Harris relayed to another Luster employee that Tropical was interested in large-scale project management contracts but did not have experience in that area. Harris later acknowledged to a Federal Bureau of Investigation ("FBI") agent that he knew Patricia's background was in the hotel industry and that Tropical was a "mom and pop operation." Between July 2010 and January 2011, Patricia e-

---

[3] Patricia testified on direct examination that Harris had provided the template for the agreement but admitted on cross-examination that she, not Harris, had provided the template. An e-mail exchange confirming that Patricia in fact provided the template was admitted into evidence.

mailed Harris several requests for information about Luster's payroll procedures and employee benefits to ensure that there would be no differences in compensation between Luster employees and Tropical employees working for the Joint Venture. With the aid of other Luster employees, Harris e-mailed Patricia the requested information.

Over the course of its existence, the Joint Venture was awarded three 8(a) sole-source contracts, of which two are at issue in this case: a construction-management consultation contract with the USACE division in Galveston ("the Galveston project") and an energy usage assessment project with Fort Bliss U.S. Army Base in El Paso ("the Fort Bliss project"). The Galveston project was composed of two segments. First, from August to December 2010, the Joint Venture performed an assessment of USACE Galveston's standard operating procedures and project management business. Second, beginning in April 2011, the Joint Venture prepared a follow-up report with recommended improvements based on the Joint Venture's previous assessment. The follow-up contract had a one-year term and gave USACE Galveston the option of a two-year extension.

To obtain the Galveston project contract, Harris negotiated on behalf of the Joint Venture with Jason Foltyn, a project manager for USACE Galveston. The purchase order for the initial assessment phase was signed by Harris, described Harris as the Joint Venture's point of contact, and referred to itself as "a direct award between the contracting officer and the 8(a) contractor." Foltyn never encountered any representatives from Tropical during the initial phase, and though Harris informed Patricia that the assessment project had been awarded to the Joint Venture, he told her that Luster was "going to do it . . . themselves . . . because they knew what they were doing." Patricia never traveled to Galveston during the assessment phrase of the project, and none of the assessment work was performed by

Tropical. The purchase order listed a contract price of $69,994, and the Joint Venture was paid that amount in December 2010.

The second phase of the Galveston project was reflected in a separate agreement that once again was signed by Harris, described Harris as the chief point of contact, and referred to itself as "a set aside contract/procurement for the 8(a) program." The joint venture agreement was attached to the contract. During the second phase of the Galveston project, Foltyn again never encountered a representative of Tropical, and Patricia never visited the work site other than for a few hours during a kick-off event at Harris's invitation.

Luster's payroll and contracts manager, Eric Mullett, testified that the Joint Venture planned to have four employees work on the Galveston project contract—two from Luster and two from Tropical. Patricia likewise testified on cross-examination that "Harris kept saying that [Tropical] would have two employees and . . . Luster would have two employees." The two Luster employees were to manage the start-up process for approximately two months and the two Tropical employees were to join thereafter. In a January 2011 e-mail to Patricia informing her that the Galveston project contract had been awarded to the Joint Venture, Harris noted that he was in the midst of recruiting the four total employees and instructed Patricia to prepare hire packets for the two that would be assigned to Tropical. Patricia responded that she was ready to make the hires. In a May 2011 e-mail exchange that memorialized a previous phone conversation, Harris remarked to Patricia that "Luster would hire the employees," to which Patricia responded that, "as we just talked, we are just initializing operations for the JV and as Tropical gets stronger then I will be able to hire the employees as well."

In the same May 2011 e-mail exchange regarding division of labor, Patricia remarked to Harris that she "agree[d] that [they were] following the

regulations established for 8a JV." According to Mullett, Harris opined throughout the performance of the Galveston project that he understood that the labor-division rule could be satisfied "over the life of the contract."[4] Mullett testified that he shared that understanding and accordingly believed the Joint Venture's planned division of labor was permissible under SBA regulations so long as the requisite split was achieved over the life of the contract. Mullett had been introduced to the basic contours of the 8(a) set-aside program by Harris, who characterized it to Mullett as a means of allowing smaller companies "to reduce the competition level" for government contracts.

Contrary to the initial plan, Patricia ultimately determined that Tropical could not afford benefits for its two employees and never hired them, and when USACE Galveston terminated the contract in May 2012 after one year, Tropical had performed no work on the project. Between June 2011 and August 2012, the Joint Venture received fourteen payments, totaling $947,722, for the second phase of the Galveston project. Of this amount, $110,382, or 51% of the profit margin, was paid to Tropical.

The second contract awarded to the Joint Venture, the Fort Bliss project, involved "a survey [to] determine what type of alternative energy sources would be practical for use" on the base. Harris met with a Fort Bliss employee to discuss the contract before Fort Bliss had decided to award the contract as an 8(a) set-aside, but in offering the Joint Venture's services, Harris mentioned its status as an 8(a) joint venture. Fort Bliss later decided to award the contract to the Joint Venture as a sole-source 8(a) set-aside, and

---

[4] In fact, for an "indefinite quantity" contract like the Galveston project contract, absent a waiver from the SBA, the 8(a) firm "must perform the required percentage of work . . . for each performance period of the contract—i.e., during the base term and then during each option period thereafter." 13 C.F.R. § 124.510(c)(1). No record evidence suggests Harris was aware of this specific rule.

Harris remained the primary point of contact thereafter. Harris and Benny Tomlinson, the Director of Public Works at Fort Bliss, specifically negotiated over the issue of labor-division requirements, though under a different SBA regulation that the government has not suggested was violated by the Joint Venture. *See* 13 C.F.R. § 125.6(a)(1). Though performance of the contract was initially scheduled for a three-month period from June through August 2011, the contract was not finalized until August 2011 and performance was not completed until December 2011. Harris wrote in an e-mail to Patricia that "[o]ur rationale is to get an initial contract that we can potentially use for future, more lucrative contracts." However, according to Tomlinson, the Fort Bliss contract "was supposed to be a stand-alone, single effort" rather than "part of a series of contracts."

In August 2011, shortly before the Fort Bliss contract was awarded, Mullett discovered and reported to Harris a recent change in the SBA regulations for 8(a) joint ventures. As relevant here, the new regulations specified that the 8(a) firm participating in an 8(a) joint venture must perform 40% of the labor on each contract awarded to the joint venture. *Bus. Dev./Small Disadvantaged Bus. Status Determinations*, 76 Fed. Reg. 8222, 8242–44 (Feb. 11, 2011) (codified at 13 C.F.R. § 124.513(d)). Previously, SBA regulations had required that the 8(a) firm complete "a significant portion" of the work on the contract but did not specify a percentage. *Id.*; 13 C.F.R. § 124.513(d) (1999). Mullett testified at trial that his realization that the 40% requirement post-dated the creation of the Joint Venture[5] meant that "it was possible that now the requirement for them to perform on a contract was less than . . . what we previously believed." In an August 16, 2011 e-mail to Patricia copied to several Luster employees reporting that the Joint Venture

---

[5] The Joint Venture had been created in July 2010, and the new regulations did not take effect until March 2011.

had obtained the Fort Bliss contract, Harris relayed from Mullett that because "the stringent self performance issues came out after we created the JV, . . . we might not be held to that standard . . . due to the JV being grandfathered." Harris asked Patricia "to validate" Mullett's understanding of the rules "with [he]r SBA rep" because it would inform whether "we will need Tropical to pick up some of" "the members of the team we have amassed" as employees. Mullett testified that the request to clarify the issue with the SBA had been repeated to Patricia several times and he did not know whether she had done so.

In the August 16 e-mail to Patricia, Harris indicated that if the relevant SBA regulations were not applicable, Patricia could choose whether to put some of the Joint Venture team members for the Fort Bliss project "on your payroll as Tropical employees," noting that "[i]t might be a good idea, if only 1099 employees, to demonstrate 8(a) self performance." The following day, Harris reported to Robert Luster and Les Hunkele that Patricia "indicated she does want to have employees on the Fort Bliss gig," and asked "[w]hat is our plan to offer her?" Robert Luster replied with the names and positions of two employees that he anticipated would be hired by Tropical, but added that "[i]t would be a lot easier from a management perspective if Luster had all the hires and we kept Tropical out. The concern is will this be ok from the SBA perspective?" The record does not indicate that Harris or Hunkele responded, but ten days later on August 26, 2011, Hunkele e-mailed Harris and Robert Luster asking whether "we solved this issue of who works for Luster and who works for Tropical." Hunkele cautioned "that we are going to get caught up in it if we don't get it right, and soon. I don't know the penalty for violation of that clause but it could be 'expensive' and long lasting." The e-mail noted an upcoming kickoff event for the Fort Bliss project, and expressed a concern that a sign-in list for the event would reflect

that Patricia was the only Tropical employee in attendance, and that "providing that list to [the Fort Bliss contracting officer] could lead down the primrose path." Hunkele also mentioned that another Luster employee "had a question about the applicability of the contract clause," noting that "[t]he one general clause on work performance was enacted several years before the JV was formed." Robert Luster replied, with Harris still copied, assuring Hunkele that two Joint Venture employees would go on Tropical's payroll and adding that the "[f]act Tropical only has [Patricia] at the meeting is not a show stopper."

Ultimately, Tropical performed no work on the Fort Bliss Contract, and the Fort Bliss employee charged with administering the contract had no contact with Patricia, Charles, or any other Tropical employees. The record is not clear as to why the two employees that Robert Luster allocated to Tropical were never hired. Harris asserts on appeal that those two employees had duties associated with a meeting at the Public Utilities Commission of Texas that was ultimately canceled as a result of an unrelated planning decision by a Fort Bliss employee. Pursuant to the Fort Bliss project contract, the Joint venture was paid $492,169, of which $15,412, or 51% of the profits, was paid to Tropical.

In January 2013, in the midst of an investigation into the Joint Venture, FBI agents visited Charles and Patricia. In exchange for the government's agreement not to prosecute them, Charles and Patricia began to cooperate in the investigation and agreed to record meetings with Luster employees. Patricia recorded a conversation in March 2013 in which Harris stated: "Well, you need to know Eric [Mullett] has been working very hard to try to make this look like, look to the SBA like we're doing the right thing." Charles had a meeting with Harris at the Luster offices in Houston in February or March 2013 in which, per Charles's testimony, a whiteboard

## No. 15-50106

"basically said all the things that Tropical Luster was doing wrong" in terms of its 8(a) obligations, and noted that "Tropical could lose its 8(a)" status as a result. Harris later told an FBI agent that he had called the meeting because "he wanted to make sure everything looked legitimate." In the meeting, after discussing the notes on the whiteboard, Harris remarked that he was "working to do" an additional project "similar to what they did in Galveston."

### C. Procedural History

In June 2013, Harris was indicted on seventeen counts of wire fraud under 18 U.S.C. § 1343. Counts 1 and 2 of the indictment reflected two electronic payments to the Joint Venture under the Fort Bliss contract. Counts 3 through 17 of the indictment reflected fifteen electronic payments to the Joint Venture under the Galveston contract, with count 3 reflecting the payment for the assessment phase and counts 4 through 17 reflecting payments for the follow-up phase. With respect to both contracts, the indictment charged Harris with "having devised . . . [a] scheme and artifice to defraud . . . [various government agencies] by means of the materially false pretense, and material misrepresentations, that the Joint Venture was in compliance with the rules of the Section 8(a) program." The government subsequently filed a bill of particulars, alleging several such "misrepresentations or pretenses."

Among other motions for discovery, Harris moved for court-ordered use immunity for Robert Luster so that he could testify without having to invoke his Fifth Amendment privilege against self-incrimination. Harris argued that Luster possessed "essential exculpatory evidence" not within the personal knowledge of any other witness, but that the government had, for no legitimate prosecutorial purpose, refused to grant Luster immunity. The district court denied the motion, noting that the government "regards Mr. Luster as a focus of its investigation and a potential target for prosecution."

No. 15-50106

During an exchange regarding jury instructions, Harris objected to the government's proposal to give the pattern jury instruction for aiding-and-abetting liability, which provides in part that "the guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged."  The government responded that it wanted the instruction given to avoid confusion but expressly disclaimed aiding-and-abetting liability, noting that it was "not the government's theory of the case.  It never has been."  The district court overruled the objection, and the jury received the aiding-and-abetting instruction.

A jury found Harris guilty on all counts except for Count 3.  At sentencing, the district court began from a base offense level of seven.  *See* U.S. Sentencing Guidelines Manual § 2B1.1(a)(1) (U.S. Sentencing Comm'n 2014).  Harris received a two-level adjustment for his role in the offense, a two-level adjustment for abuse of a position of trust, and a sixteen-level increase under § 2B1.1(b)(1)(I) for the amount of loss sustained, resulting in a total offense level of twenty-seven.  Because Harris was in the lowest criminal history category, his Guidelines range was 70–87 months.  The district court departed downward and imposed a sentence of 24 months' imprisonment followed by three years of supervised release, as well as a fine of $25,000.

Both in his objections to the PSR and at sentencing, Harris challenged the loss calculation that led to the sixteen-level enhancement under § 2B1.1(b)(1).  The district court determined that an offense-level increase of sixteen levels was appropriate after having calculated the loss amount as approximately $1.3 million.  That loss amount encompassed "the total amount awarded under both contracts," "[n]ot including the payment corresponding to the count of wire fraud for which [Harris] was acquitted."

13

No. 15-50106

Harris appealed.  After the district court denied his motion for bond pending appeal, Harris began serving his sentence in April 2015.

## II.

Harris challenges the sufficiency of the evidence as to his wire fraud conviction under 18 U.S.C. § 1343.  We review *de novo* a preserved challenge to the sufficiency of the evidence, viewing all evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict.  *United States v. Eghobor*, 812 F.3d 352, 361–62 (5th Cir. 2015).  This standard is "highly deferential to the verdict."  *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015) (citation omitted).  "'The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt,' in order to be sufficient."  *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quoting *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999)).  Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To support a wire fraud conviction, the government must prove: (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud.  *United States v. Kuhrt*, 788 F.3d 403, 413–14 (5th Cir. 2015), *cert denied* 136 S. Ct. 1376 (2016).  Harris argues on appeal that the government failed to present evidence of a scheme to defraud or evidence that he acted with the requisite specific intent to defraud.

### A. Scheme to Defraud

The government alleged a scheme to defraud by which Harris and others induced government agencies to award the Joint Venture contracts for

14

which it was not eligible. Our case law indicates that in order to show a scheme to defraud, the government "ha[s] to prove that [the defendant] made some kind of a false or fraudulent material misrepresentation." *United States v. Curtis*, 635 F.3d 704, 718 (5th Cir. 2011); *accord United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009); *United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007); *see also Curtis*, 635 F.3d at 718 n.49 (describing a "false or fraudulent material misrepresentation" as a standalone element of wire fraud). Before trial, the government submitted a bill of particulars itemizing the alleged false representations on which its prosecution was based: (1) references in the Galveston and Fort Bliss project contracts to the 8(a) set-aside program, which, according to the government, impliedly represented that the Joint Venture would comply with 8(a) regulations; (2) assertions in the Joint Venture agreement that Charles Winters would serve as "program director" and negotiator and that Joint Venture records would be kept at Tropical's offices; (3) comments in Joint Venture meeting minutes indicating that Tropical had become increasingly involved in managing duties; (4) assertions in invoices prepared by Harris that the invoices had been reviewed by Patricia Winters; and (5) the false pretense[6] created by Harris in personal interactions with USACE Galveston and Fort Bliss personnel that Tropical was a bona fide participant in the performance of the respective contracts.

---

[6] In listing Harris's "false pretense" among the government's theories of its prosecution, the bill of particulars explained that "[a] 'pretense' is somewhat different than a representation," and "may be premised on misleading conduct without an explicit statement." (quoting *In re Davis*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007)). Again on appeal, the government seeks affirmance based on evidence of both "false representations" *and* "false pretenses." Because we hold that the government has produced sufficient evidence of discrete false representations, we do not consider whether a wire fraud conviction could stand absent such evidence on a "false pretenses" theory.

No. 15-50106

Because at least the Galveston and Fort Bliss project contracts contained false representations attributable to Harris, a reasonable jury could have concluded that Harris engaged in a scheme to defraud. The Galveston project contract referred to itself as "a set aside contract/procurement for the 8(a) program." The contract also enclosed as an attachment the Joint Venture agreement, including its provision that "[e]ach Party acknowledges and recognizes its obligation and responsibility to comply with all applicable federal, state and local laws, regulations, and rules in carrying out any activity related . . . to the Joint Venture." The Fort Bliss contract likewise referred to itself as a "set-aside 8(a)." Harris negotiated and signed both contracts, and thus any representations in them are undoubtedly attributable to him.

A reasonable jury could have understood that the references to the 8(a) program in the Galveston and Fort Bliss project contracts impliedly represented that the Joint Venture would comply with applicable 8(a) joint venture regulations, including the 40% labor-division requirement. *See In re Mercer*, 246 F.3d 391, 404–07 (5th Cir. 2001) (en banc) (holding that use of a credit card constitutes an implied representation of intent to pay the resulting debt, which, if false, renders the debt non-dischargeable under 11 U.S.C. § 523(a)(2)(A)); *see also Durland v. United States*, 161 U.S. 306, 313 (1896) (holding that the mail fraud statute proscribes not only "representations as to the past or present," but also "suggestions and promises as to the future"). Indeed, Luster employee Les Hunkele appeared to give the Fort Bliss contract that very meaning when, in his August 26, 2011 e-mail to Harris and Robert Luster, he raised the labor-division issue in the context of "the contract clause."

Because the Galveston and Fort Bliss contracts were awarded as 8(a) set-asides, there can be no doubt that Harris's representations of 8(a)

compliance were material to USACE Galveston and Fort Bliss, the procuring agencies. *See Neder v. United States*, 527 U.S. 1, 16, 20–25 (1999) (holding that a false statement can support a conviction under 18 U.S.C. § 1343 only if it is material—that is, "if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed'") (alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).  The implied representations of 8(a) compliance in the project-specific contracts are sufficient evidence from which a reasonable jury could have concluded that Harris engaged in a scheme to defraud.

Having thus concluded, we dispose briefly of the government's additional alleged false representations.  The Joint Venture agreement, even if it contained false representations about Charles's role, was neither signed nor submitted to the SBA by Harris, and the template for the agreement was pulled from the SBA website and distributed by Patricia, not Harris.[7]  As for the Joint Venture meeting minutes and internal invoices, any misrepresentations in those documents cannot have been *material* because they were not transmitted outside the Joint Venture.  *See Neder*, 527 U.S. at 16, 20–25.

In challenging the sufficiency of the evidence as to whether he made a material misrepresentation, Harris argues that the government's case amounted to a prosecution for silence in the absence of a duty to speak, which cannot constitute a scheme to defraud.  If the evidence showed that Harris discovered that the Joint Venture would not comply with SBA regulations

---

[7] We have previously indicated that a wire fraud defendant can be criminally responsible for the misrepresentations of others where the jury received an aiding-and-abetting instruction.  *Curtis*, 635 F.3d at 719 & n.52.  Though the jury did receive such an instruction in this case, when Harris objected, the government expressly disclaimed aiding and abetting liability, noting it was "not the government's theory of the case.  It never has been."

only *after* having represented the opposite to USACE Galveston and Fort Bliss, Harris's argument would carry significant weight. Nondisclosure can constitute proof of a scheme to defraud only where the defendant is under a duty to disclose. *See United States v. Gaspard*, 744 F.2d 438, 440 (5th Cir. 1984); *United States v. Balland*, 663 F.2d 534, 540–41 & n.16 (5th Cir. Unit B Dec. 1981). Ongoing duties to report regulatory compliance to the SBA run to the procuring agency and to the 8(a) participant in the joint venture, not to the non-8(a) participant, *see* 13 C.F.R. §§ 124.510(c)(5), 124.513(i), and SBA representative Debra Dimando testified that Harris had no such duty to disclose. But Harris's guilt-by-silence argument misses that the government points to his affirmative, even if implicit, representations of regulatory compliance in the project-specific contracts with USACE Galveston and Fort Bliss. Whether a reasonable jury could have found that Harris knew *at the time* that those representations were false goes to the issue of intent, to which we turn next.

### B. Intent

Harris argues that the evidence was insufficient as to his specific intent to defraud. The government points to several pieces of evidence from which it argues the jury could have concluded that Harris knew from the outset that Tropical would not contribute to the performance of the Joint Venture's contracts. The government contends that those pieces of evidence show that Harris knew that his representations regarding the Joint Venture's regulatory compliance were false at the time he made them, and thus that he possessed a specific intent to defraud. Specifically, the government points to: (1) evidence that Harris knew, from the beginning, that Tropical lacked relevant experience and would not be able to perform its requisite share of the contracts as a result; (2) Harris's comment to Patricia, around the time that the Galveston project contract was awarded to the Joint Venture, that

Luster was "going to do it . . . themselves . . . because they knew what they were doing"; and (3) Harris's comments, made to Patricia while she was recording their conversations for the FBI, to the effect that Luster had been "working very hard to try to make this look like, look to the SBA like we're doing the right thing."

In response, Harris identifies several pieces of evidence showing that, at the time he executed the Galveston and Fort Bliss project contracts, he honestly believed Tropical would serve as a legitimate partner in the joint venture and would complete its fair share of the work.  In particular, Harris points to: (1) his extended exchange with Patricia over employee benefits, which reflects his belief that Tropical would hire employees; (2) his repeated communications to Mullett and Patricia to the effect that Tropical would hire two employees for the Galveston project; (3) e-mail exchanges reflecting his honest confusion about the division-of-labor requirement, both as to whether the specific 40% requirement applied despite post-dating the Joint Venture agreement and as to whether the requirement could be satisfied over the life of the contract; and (4) the fact that employee slots allocated to Tropical were eliminated for reasons outside of his control.

Though Harris's evidence of good faith is substantial and the government's evidence of intent is thin indeed, we ultimately conclude in light of the highly deferential standard of review in this context that a reasonable jury could have found that Harris had a specific intent to defraud. *See Roetcisoender*, 792 F.3d at 550.  In particular, Harris's comment to Patricia that Luster would perform the assessment phase of the Galveston project contract "because they knew what they were doing" shows that Harris was aware—even before positions allocated to Tropical were unexpectedly eliminated—that Tropical's lack of experience would impede its involvement in the Joint Venture's work.  Even if Harris honestly believed that the labor

allocation requirement could be satisfied over the life of the contract, that belief would not explain his exclusion of Tropical from the assessment phase of the Galveston project contract, which was actually a standalone contract. Moreover, the jury was instructed that "[g]ood faith is a complete defense to the charges of wire fraud contained in the indictment since good faith on the part of the Defendant is inconsistent with the intent to defraud or willfulness which is an essential part of the charges." To the extent that the evidence could have supported a finding of either good faith or intent to defraud, we are not free to second-guess the jury's choice of one view of the evidence over another. *See United States v. Vargas-Ocampo*, 747 F.3d 299, 300–02 (5th Cir. 2014) (en banc) (abandoning use of the "equipoise rule"). "'The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt,' in order to be sufficient." *Grant*, 683 F.3d at 642 (citation omitted).

Because a reasonable jury could have concluded that Harris intended from the beginning that Tropical would lend no more than its 8(a) status to the Joint Venture—that is, that Harris had a specific intent to defraud—Harris's sufficiency-of-the-evidence challenge fails.

### III.

Harris also challenges his sentence, arguing that his offense level under the Guidelines was enhanced based on an improperly calculated loss amount. "Although we review the district court's loss calculations for clear error, we review the district court's *method* of determining the amount of loss, as well as its interpretations of the meaning of a sentencing guideline, *de novo*." *United States v. Nelson*, 732 F.3d 504, 520 (5th Cir. 2013) (citations omitted). Because Harris challenges the district court's method of determining the loss amount for purposes of § 2B1.1(b)(1), our review is *de novo*.

Section 2B1.1(b)(1) of the Guidelines provides for escalating offense-level increases depending on the amount of loss, in dollars, that resulted from the defendant's offense.  Section 2B1.1(b)(1) itself does not explain how the amount of loss should be calculated; instead, we look to Application Note 3, which governs "the determination of loss under subsection (b)(1)."  § 2B1.1 cmt. n.3; *see, e.g.*, *Kuhrt*, 788 F.3d at 422–23; *see also United States v. Ochoa-Gomez*, 777 F.3d 278, 282 (5th Cir. 2015) ("The application notes accompanying a Guideline generally bind federal courts unless they are inconsistent with the text of the Guideline.").

Typically, the loss amount that dictates the proper offense-level increase under § 2B1.1(b)(1) is determined using Application Note 3(A), the general rule for loss calculation.  The general rule looks to the greater of actual loss or intended loss—that is, the greater of the pecuniary harm that foreseeably resulted or that was intended to result from the offense.  § 2B1.1 cmt. n.3(A).  In this case, however, the district court calculated loss using the government benefits rule, one of several special rules that supplant the default general rule whenever they apply.  *See* § 2B1.1 cmt. n.3(F).  The government benefits rule provides, in full:

> *Government Benefits.*—In a case involving government benefits (*e.g.*, grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be.  For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

§ 2B1.1 cmt. n.3(F)(ii).  The district court adopted the government's position that contracts awarded under the 8(a) set-aside program are "government benefits" subject to the special rule and that the Joint Venture in its entirety was the relevant "unintended recipient," such that the entire contract values constituted loss.   The   district   court   calculated   a   loss   amount   of

21

No. 15-50106

$1,317,593.51—leading to a sixteen-level enhancement under § 2B1.1(b)(1)—by adding the total face values of the Galveston and Fort Bliss contracts, less the value of the wire transaction associated with the count on which Harris was acquitted.

Harris argued to the district court, and argues again on appeal, that the government did not show any harm to the procuring agencies—USACE Galveston and Fort Bliss—because they received the work for which they paid under their respective contracts with the Joint Venture. Harris further argues that the loss amount resulting from his offense should reflect the harm caused to Tropical, not the procuring agencies, but that in either case the true loss amount is zero, because neither Tropical nor the agencies suffered pecuniary harm. In the alternative, Harris posits that if the loss amount cannot reasonably be determined, the court may look instead to his gain from the scheme, which he asserts is also zero. *See* § 2B1.1 cmt. n.3(B) ("The court shall use the gain that resulted from the offense as an alternate measure of loss only if there is a loss but it reasonably cannot be determined.").

## A. The Government Benefits Rule vs. the General Rule

We first consider whether government contracts awarded through an affirmative action contracting program are "government benefits" under § 2B1.1 cmt. n.3(F)(ii), such that procurement frauds involving those contracts are properly treated under the special government benefits rule for loss calculation rather than under the general rule. We conclude that they are not and that the district court should have applied the general rule in this case.

The application notes to § 2B1.1 indicate that procurement frauds typically should be treated under the general loss calculation rule. The general rule contains a rule of construction that dictates how the general rule

22

should be construed "[i]n the case of a procurement fraud, such as a fraud affecting a defense contract award." § 2B1.1 cmt. n.3(A)(v)(II). Consistent with this rule of construction's appearance within the general loss calculation rule, this court has typically treated procurement frauds under the general rule. *See, e.g., United States v. Wilson*, 453 F. App'x 498, 504–05 (5th Cir. 2011); *United States v. Benson*, 449 F. App'x 400, 401–02 (5th Cir. 2011); *United States v. Sublett*, 124 F.3d 693, 694–95 (5th Cir. 1997). Applying the general rule is particularly appropriate here, because this case involves "a fraud affecting a defense contract award,"[8] the very example referenced in the rule of construction. *See* § 2B1.1 cmt. n.3(A)(v)(II).

We conclude that the typical treatment of procurement frauds should not be discarded in this case merely because the government contracts at issue were awarded as sole-source contracts under the 8(a) set-aside program. Procurement contracts awarded under the 8(a) program are not "government benefits" so as to trigger the special government benefits loss calculation rule and obviate the general rule. By its own terms, the government benefits rule supplants the general rule only "[i]n a case involving government benefits (*e.g.*, grants, loans, entitlement program payments)." § 2B1.1 cmt. n.3(F)(ii). While the three listed examples do not exhaust the category of "government benefits"—the list is preceded by "*e.g.*"—they are certainly illustrative and limit the category to things sharing their common features. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012) (describing the *noscitur a sociis* canon); *see also United States v. Austin*, 479 F.3d 363, 367–68 (5th Cir. 2007) ("When interpreting the

---

[8] The two contracting agencies in this case, USACE Galveston and Fort Bliss, are both organs of the Department of Defense.

No. 15-50106

commentary [to the Guidelines], we apply ordinary rules of statutory construction.").

While a government contract awarded under an affirmative action program may be, in some sense, a "benefit" to the company awarded the contract, it does not share the common features of grants, loans, and entitlement program payments.  Unlike the three enumerated examples, a contract award is not a unilateral transfer, but rather a bargained-for exchange for services rendered.  And unlike the enumerated examples, contracts awarded under the 8(a) program do not exist primarily to benefit the awardee; rather, such contracts first and foremost serve the government's own procurement needs.  *See* 15 U.S.C. § 644(g)(2)(B) (requiring that each federal agency's annual goals for the participation of disadvantaged small businesses in the agency's procurement contracts "shall realistically reflect the potential of . . . small business concerns owned and controlled by socially and economically disadvantaged individuals . . . to perform such contracts").

Our previous precedential applications of the government benefits rule have been confined to the three enumerated examples.  We have applied the government benefits rule to fraudulent schemes clearly involving "grants," *see Nelson*, 732 F.3d at 521–23 (EPA grants); *United States v. Hebron*, 684 F.3d 554, 560–61 (5th Cir. 2012) (FEMA disaster relief reimbursements), "loans," *see United States v. Dowl*, 619 F.3d 494, 502–04 (5th Cir. 2010) (SBA loans), and "entitlement program payments," *see United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007) (Medicare reimbursements); *United States v. Harms*, 442 F.3d 367, 380 (5th Cir. 2006) (workers' compensation benefits). *But see United States v. Lopez*, 486 F. App'x 461, 466–67 (5th Cir. 2012) (unpublished).  Our published cases provide no reason to apply the government benefits rule to procurement contracts that bear little resemblance to grants, loans, and entitlement program payments.

No. 15-50106

Our sister circuits are split on whether the government benefits rule applies to procurement frauds involving contracts awarded under affirmative action programs. The Ninth Circuit has squarely rejected the government benefits rule in this context, reasoning that "[t]he examples given [in the text of the rule]—loans, grants and entitlement program payments—confirm that this comment deals with unilateral government assistance, such as food stamps, not a fee-for-service business deal." *United States v. Martin*, 796 F.3d 1101, 1109 (9th Cir. 2015). The Third Circuit has left undecided whether the government benefits rule applies. *United States v. Nagle*, 803 F.3d 167, 179–83 & n.9 (3d Cir. 2015), *cert. denied* 136 S. Ct. 1238 (2016).[9] Concurring in *Nagle*, Judge Hardiman indicated that he would have rejected the government benefits rule outright because lying to the government in order to receive contracts that otherwise would have gone to others "is classic procurement fraud," which should be treated under the general rule for loss calculation. *Id.* at 183–84 (Hardiman, J., concurring).

The Fourth Circuit has applied the government benefits rule in this context without explanation. *See United States v. Brothers Constr. Co. of Ohio*, 219 F.3d 300, 317–18 (4th Cir. 2000). The Seventh and Eleventh Circuits have also applied the rule, reasoning that contracts awarded under the programs at issue were "government benefits" because the "primary purpose" of the programs was "to help small minority-owned businesses develop and grow." *United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009); *accord United States v. Leahy*, 464 F.3d 773, 789–90 (7th Cir. 2006). In an unpublished decision issued before a circuit split existed, we echoed the reasoning of these latter circuits and applied the government benefits rule in

---

[9] The Third Circuit had previously applied the government benefits rule in this context in an unpublished case. *See United States v. Tulio*, 263 F. App'x 258, 263 (3d Cir. 2008). In its subsequent *Nagle* decision, however, the Third Circuit characterized *Tulio* as "cursory" and expressly repudiated it. *Nagle*, 803 F.3d at 182–83, nn.9–10.

25

a case involving a program that directs federal procurement contracts to non-profits that employ people who are blind or severely disabled. *Lopez*, 486 F. App'x at 466–67.

We are not persuaded by the reasoning of the cases applying the government benefits rule to contracts awarded under affirmative action programs. Those cases do not address the textual issues discussed above. The mere fact that a government contract furthers some public policy objective apart from the government's procurement needs is not enough to transform the contract into a "government benefit" akin to a grant or an entitlement program payment. We accordingly hold that procurement frauds involving contracts awarded under the 8(a) set-aside program, like procurement frauds generally, should be treated under the general rule for loss calculation, not the government benefits rule.

### B. Loss Under the General Rule

With our analysis properly rooted in the general loss calculation rule, we turn to whether the district court erred in treating as loss the entire face value of the contracts awarded to the Joint Venture. We conclude that the loss amount should have reflected not the total contract price, but rather the contract price less the fair market value of services rendered by the Joint Venture to the procuring agencies.[10]

When calculating loss for purposes of § 2B1.1(b)(1), Application Note 3(E) dictates that "[l]oss shall be reduced by . . . the fair market value of the property returned and the services rendered, by the defendant or other

---

[10] Here and throughout the opinion, we use the phrase "fair market value of services rendered" to refer to the value of those services *in the market for services to the government*, both inside and outside the 8(a) program. That value may differ from the value of the same services in the private market. *See, e.g.*, 41 U.S.C. §§ 6502, 6703 (requiring payment of prevailing wage to employees of contractors providing goods and services to the federal government); 41 C.F.R. § 50-201.3 (requiring payment of prevailing wage to employees of various suppliers of the federal government).

persons acting jointly with the defendant, to the victim before the offense was detected." § 2B1.1 cmt. n.3(E)(i). Application Note 3(E) applies broadly to loss calculations under § 2B1.1(b)(1), including calculations under the general rule. *See, e.g.*, *United States v. Morrison*, 713 F.3d 271, 279, 282 (5th Cir. 2013) (applying Application Note 3(E) to loss calculation under the general rule); *United States v. Klein*, 543 F.3d 206, 213–15 (5th Cir. 2008) (same). Indeed, the Sentencing Commission speaks clearly when it wants to exempt specific types of cases from the default practice of crediting against loss the value of services rendered by the defendant. *See* § 2B1.1 cmt. n.3(F)(v) (providing that, in the relevant cases,[11] "loss shall include the amount paid for the property, services, or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services"). The Third and Ninth Circuits found these provisions persuasive in deciding that loss in an affirmative action contracting fraud case must be reduced by the fair market value of services rendered by the defendant. *Nagle*, 803 F.3d at 181–83; *Martin*, 796 F.3d at 1108, 1110–11.[12] So do we.

---

[11] Though we have referred to Application Note 3(F)(v) as applying broadly to "frauds involving government agencies," *United States v. McLemore*, 200 F. App'x 342, 344 (5th Cir. 2006), it does not apply in this case because Harris did not "falsely pos[e] as [a] licensed professional[]." § 2B1.1 cmt. n.3(F)(v)(I). *Compare Martin*, 796 F.3d at 1110 (declining to apply Note 3(F)(v) where defendant had fraudulently obtained government contract under affirmative action contracting program), *with United States v. Giovenco*, 773 F.3d 866, 868, 870–71 (7th Cir. 2014) (applying Note 3(F)(v) where defendant used fraudulently obtained government certification to secure contract with another private party). No party asks us to apply Note 3(F)(v) in this case.

[12] The Fourth, Seventh, and Eleventh Circuits, confronted with similar facts, have declined to reduce loss by the value of services provided, but each court's analysis was embedded in the language of the government benefits rule that we hold does not apply. *See Brothers Constr. Co.*, 219 F.3d at 317–18; *Leahy*, 464 F.3d at 789–90; *Maxwell*, 579 F.3d at 1305–07. Furthermore, *Brothers Construction Co.* (applying 1997 Guidelines) and *Leahy* (applying 1998 Guidelines) were decided under former U.S.S.G. § 2F1.1, which did not contain an application note requiring that loss be reduced by the fair market value of services rendered akin to current § 2B1.1 cmt. n.3(E)(i). *See* U.S. Sentencing Guidelines Manual § 2F1.1 cmt. nn.7–12 (U.S. Sentencing Comm'n 1998). Former § 2F1.1 covered

No. 15-50106

Furthermore, our previous cases evaluating procurement frauds under the general loss calculation rule have deducted the value of services rendered under the contract. In *United States v. Sublett*, we vacated the sentence of a mail fraud defendant who had fraudulently obtained counseling services contracts from the Internal Revenue Service by misrepresenting his academic and professional credentials. 124 F.3d at 694–95. We held that, because the defendant had provided properly credentialed counselors to perform portions of the contracted-for services, the district court erred in treating the entire value of the contracts as loss. *Id.* Instead, we directed the district court to "deduct the value of the legitimate services actually provided." *Id.* at 695; *accord United States v. Jones*, 475 F.3d 701, 706 (5th Cir. 2007) ("In the context of a contract, the court must credit the defendant for the value of the performed services.").

Treating the loss amount as the difference between the contract price and the fair market value of services rendered is consistent with our case law's requirement "that the loss inquiry focus on the 'pecuniary impact on [the] victims' and utilize a 'realistic, economic approach.'" *United States v. Lige*, 635 F.3d 668, 671 (5th Cir. 2011) (alteration in original) (quoting *United States v. Olis*, 429 F.3d 540, 545–46 (5th Cir. 2005)). Acute focus on these principles is especially important in fraud cases because the fraud cases treated under § 2B1.1 are something of a mixed bag, involving different economic realities and different relationships among defendant, victim, and loss amount. *United States v. Gupta*, 463 F.3d 1182, 1199 (11th Cir. 2006) ("Fraud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused.");

---

fraud offenses and was consolidated with § 2B1.1 in the 2001 Guidelines. *See generally*, Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35 Ind. L. Rev. 5 (2001).

28

*see also, e.g., Olis*, 429 F.3d at 546–47 (collecting cases using different loss calculation methodologies in light of different types of securities fraud).

Treating the loss amount under these circumstances as the difference between the contract price and the fair market value of services provided properly focuses the loss inquiry on the pecuniary impact on victims. The relevant victims in this case are the procuring agencies—USACE Galveston and Fort Bliss—not Tropical. The Government charged Harris with executing a "scheme to defraud [the government agencies involved]," and the PSR identified the agencies, not Tropical, as the victims of the scheme. Our sister circuits confronted with similar facts have likewise referred to the contracting agencies as the relevant "defrauded parties" for loss calculation purposes. *Nagle*, 803 F.3d at 180; *see also Martin*, 796 F.3d at 1109–11 (describing "pecuniary harm to the government"). Pecuniary harm suffered by a co-participant in a procurement fraud scheme can sometimes count toward the losses used in determining the defendant's sentence, but we have described that possibility only in the context of a co-participant whose involvement in the scheme amounted to "assent to extortion." *United States v. Geeslin*, 447 F.3d 408, 408, 411 (5th Cir. 2006). Here, by contrast, Patricia and Tropical were willing participants in the fraudulent scheme. Moreover, Tropical suffered no pecuniary harm as a result of Harris's offense and, in fact, realized a windfall. *See* § 2B1.1 cmt. n.1 (defining "victim" as, *inter alia*, "any person who sustained any part of the actual loss"); *id*. cmt. n.3(A)(i) (defining "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense"). The contracting agencies are the victims in this case.

The difference between the contract price and the fair market value of services rendered reflects the contracting agencies' losses under their respective contracts—the difference between what they paid and what they

received.    It should come as little surprise that such a loss calculation coincides with one measure of common-law contract damages in a civil action for fraudulent inducement: "the difference between the value expended versus the value received" by the defrauded party, a measure which "allow[s] the injured party to recover based on the actual injury suffered." *Zorilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *accord* 27 Richard A. Lord, *Williston on Contracts* § 69.53 (4th ed. 2002); *cf. Olis*, 429 F.3d at 546 (using "civil damage measure" as "the backdrop for criminal responsibility" in calculating the loss resulting from a securities fraud).

Treating the loss amount as the difference between the contract price and the fair market value of services rendered also reflects a "realistic, economic approach."  Such a loss calculation "is consistent with the idea that fraud is not always the same as theft," even though the loss amounts resulting from both types of crimes are treated under § 2B1.1(b)(1).  *Martin*, 796 F.3d at 1108.  In some procurement fraud cases, the defendant pockets the entire contract price; in others, the defendant obtains by fraud a contract that he would not have obtained legitimately, but nevertheless performs the contract, pocketing only the difference between the contract price and his costs.  *See United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991) (distinguishing between the two scenarios for loss calculation purposes). "[O]ne who uses fraud to procure a contract but intends to provide the contracted-for services . . . should not be characterized as causing as much loss as one who intends to totally cheat the victim, giving nothing in return." *Sublett*, 124 F.3d at 695.  Reducing the contract price by the fair market value of any services provided avoids treating identically these two meaningfully different types of fraud and ensures that the economic realities of each are reflected in the loss amount used to calculate the sentencing range.

By treating the entire face value of the contracts as loss for purposes of § 2B1.1 and not deducting the fair market value of services rendered by the Joint Venture, the district court procedurally erred in calculating the Guidelines range. We must remand upon identifying such a Guidelines error unless the government establishes that the error was harmless. *United States v. Juarez*, 812 F.3d 432, 437–38 (5th Cir. 2016). Even where, as here, the district court imposed a sentence below the erroneous Guidelines range, the sentence must be vacated unless the government convincingly demonstrates that the sentence "was not influenced in any way by the erroneous Guidelines calculation." *United States v. Ibarra-Luna*, 628 F.3d 712, 719 (5th Cir. 2010). "This is a heavy burden." *Id.* at 717. Here, the government has not even attempted to argue that any such error was harmless.[13] Accordingly, we must vacate Harris's sentence and remand for resentencing.

On remand, the government will bear the burden of proof to show any difference between the contract price and the fair market value of the services rendered by the Joint Venture. *See Jones*, 475 F.3d at 706–07. This accords with the general rule that "it is the government's burden to show by a preponderance of the evidence the amount of loss attributable to fraudulent conduct." *Nelson*, 732 F.3d at 521. The current record provides no reason to doubt the district court's observation at sentencing that USACE Galveston and Fort Bliss "got what they paid for." However, because the parties were

---

[13] In any event, the Guidelines error here was almost certainly not harmless. As the government acknowledged at oral argument, the record does not clearly indicate that the district court would have imposed the same sentence, for the same reasons, regardless of the Guidelines range. Moreover, had the district court determined that the loss amount resulting from Harris's offense was actually zero, warranting no offense-level increase under § 2B1.1, because the fair market value of services rendered by the Joint Venture equaled the contract values, then the Guidelines range would have fallen well below 24 months' imprisonment, and Harris would have been eligible for a sentence of probation. *See* U.S.S.G. § 5C1.1(c).

not previously on notice that the loss inquiry in this case would take account of the fair market value of services rendered by the Joint Venture, we remand on an open record in the interest of fairness. *See Martin*, 796 F.3d at 1111. The government will also bear the burden to show any of the miscellaneous costs described in the rule of construction for procurement fraud cases. *See* § 2B1.1 cmt. n.3(A)(v)(II).

Because we remand with instructions for the proper calculation of loss under the circumstances of this case, we do not reach Harris's argument that, under Application Note 3(B), his gain from the offense—which he argues is zero—can be used "as an alternative measure of loss." § 2B1.1 cmt. n.3(B). Note 3(B) instructs that a defendant's gain should be used "only if there is a loss but it reasonably cannot be determined." *Id.* Harris is free to argue on remand that the loss in this case cannot reasonably be determined even under the method we articulate, but it would be premature for us to address that possibility in the case's current posture. We do observe that, as the district court noted in rejecting the government's request for restitution, Harris was "not enriched in any way by anything that transpired here."

## IV.

For the foregoing reasons, we AFFIRM the conviction, VACATE the sentence, and REMAND for resentencing.